### State of Vermont and City of Burlington v. Central Vermont Railway, Inc.

[571 A.2d 1128]

No. 87-607

Present: Allen, C.J., Peck, J., and Barney, C.J. (Ret.), Springer, D.J. (Ret.) and Costello, D.J. (Ret.), Specially Assigned

Opinion Filed December 22, 1989

338

*Jeffrey L. Amestoy*, Attorney General, and *J. Wallace Malley, Jr.*, Assistant Attorney General, Montpelier, for Plaintiff-Cross-Appellant State of Vermont.

*John L. Franco, Jr.,* Assistant City Attorney, Burlington, for Plaintiff-Cross-Appellant City of Burlington.

*Fred I. Parker, Liam L. Murphy* and *Neal D. Ferenc,* Law Clerk (On the Brief), of *Langrock Sperry Parker & Wool*, Burlington, for Defendant-Appellant.

*Stephen Dycus* and *Richard O. Brooks,* Professors, and *Peter Anthony* and *Barbara Grabowski,* Law Students, South Royalton, for Amicus Curiae Environmental Law Center.

**Peck, J.** At issue in this case is title to a 1.1 mile strip of filled lands lying along the City of Burlington's waterfront. In response to recent efforts by Central Vermont Railway (CVR) to sell this property to a real estate developer, the City and the State challenged CVR's title in the Chittenden Superior Court, invoking the public trust doctrine. The court concluded that

CVR has fee simple title to the parcel at issue but held that the land must always be used for a public purpose. CVR appeals, and the State and the City cross-appeal. We modify the trial court's order and, as modified, affirm.

In 1827, legislation was enacted that granted littoral owners on Lake Champlain the right to erect wharves by adding fill to submerged lands along the lakeshore.[1] 1827, No. 38. The 1827 Act provided that persons complying with the statute would have, with their heirs and assigns, the exclusive privilege of the use, benefit, and control of the wharves forever. The purpose of this legislation was to increase commerce and trade without an expenditure of public funds.

In 1849, the Vermont Central Railroad, a predecessor of CVR, used condemnation proceedings to obtain a strip of land along the lakeshore and began filling a substantial area lakeward from this strip. By 1851, this area had been used to bring a railroad line to the waterfront. Filling operations, first by Vermont Central and later by CVR, continued until 1972. CVR also purchased contiguous lands that had been filled by others. The railroad has paid property taxes on certain portions of the lands and has sold other portions to the City and the federal government.

By the late 1970s, CVR's use of the area at issue had declined significantly. At the time of trial, the railroad had only one active customer on the waterfront.

CVR has pursued three major plans over the last decade for selling and/or developing its land along the lake, which now consists of the previously mentioned 1.1 mile strip centrally located on the City's waterfront. The first two of these plans failed to materialize, but, on December 10, 1986, the railroad entered into a purchase and sale agreement in which it agreed to sell or lease a large portion of the filled lands to a real estate developer.

---

[1] The word "wharf" is defined to include structures built with fill along a shoreline so that boats can be brought alongside them to load and unload cargo and passengers. See *Port of Portland v. Reeder*, 203 Or. 369, 384, 280 P.2d 324, 332 (1955).

The City and the State petitioned the Chittenden Superior Court for a declaratory judgment, challenging CVR's title on public trust grounds. After trial, the superior court concluded that CVR "holds the filled lands . . . in fee simple impressed with the public trust doctrine. This means that the railroad is free to convey such lands to any party, and those parties to any other parties, so long as such land is used for a public purpose." The court retained jurisdiction to resolve any dispute as to whether a proposed use of the property complies with the public purpose condition.

CVR brought the instant appeal, claiming that the trial court erred in concluding that its title is held subject to public trust limitations. CVR also argues that plaintiffs' claims are barred by estoppel and laches. The City and the State cross-appealed, urging: (1) that the trial court erred in holding that CVR has a fee simple interest in the filled lands; (2) that, even if CVR has such an interest, it is a fee simple determinable; (3) that, in any event, the legislature may revoke CVR's interest in the filled lands; (4) that only the state can act as public trustee; and (5) that allowing a private corporation to determine the uses of public trust property represents an unlawful delegation of legislative authority.

## I.

Under the public trust doctrine, the lands submerged beneath navigable waters are "held by the people in their character as sovereign in trust for public uses for which they are adapted." *Hazen v. Perkins*, 92 Vt. 414, 419, 105 A. 249, 251 (1918). Title to these lands is deemed to be "held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties." *Illinois Central Railroad v. Illinois*, 146 U.S. 387, 452 (1892). The character of this title is distinctive as compared to state-held title in other lands, *id.*, and different legal rules therefore apply. *Boston Waterfront Development Corp. v. Commonwealth*, 378 Mass. 629, 631, 393 N.E.2d 356, 358 (1979).

The public trust doctrine is an ancient one, having its roots in the Justinian Institutes of Roman law. *Id.* As one court has observed:

> For centuries, land below the low water mark has been recognized as having a peculiar nature, subject to varying degrees of public demand for rights of navigation, passage, portage, commerce, fishing, recreation, conservation and aesthetics. Historically, no developed western civilization has recognized absolute rights of private ownership in such land as a means of allocating this scarce and precious resource among the competing public demands. Though private ownership was permitted in the Dark Ages, neither Roman Law nor the English common law as it developed after the signing of the Magna Charta would permit it.

*United States v. 1.58 Acres of Land,* 523 F. Supp. 120, 122–23 (D. Mass. 1981) (citations omitted). After the American Revolution, the people of each state acquired the "absolute right to all . . . navigable waters and the soils under them for their own common use." *Martin v. Waddell,* 41 U.S. (16 Pet.) 367, 410 (1842).

Despite its antediluvian nature, however, the public trust doctrine retains an undiminished vitality. The doctrine is not "'fixed or static,' but one to 'be molded and extended to meet changing conditions and needs of the public it was created to benefit.'" *Matthews v. Bay Head Improvement Ass'n,* 95 N.J. 306, 326, 471 A.2d 355, 365 (1984) (quoting *Borough of Neptune City v. Borough of Avon-by-the-Sea,* 61 N.J. 296, 309, 294 A.2d 47, 54 (1972)). The very purposes of the public trust have "evolved in tandem with the changing public perception of the values and uses of waterways." *National Audubon Society v. Superior Court of Alpine County,* 33 Cal. 3d 419, 434, 658 P.2d 709, 719, 189 Cal. Rptr. 346, 356 (1983) (en banc). Nor is the doctrine fixed in its form among jurisdictions, as "there is no universal and uniform law upon the subject." *Shively v. Bowlby,* 152 U.S. 1, 26 (1894).

## II.

In Vermont, the critical importance of public trust concerns

is reflected both in case law and in the state constitution. Chapter II, § 67 of the Vermont Constitution provides that:

> *The inhabitants of this State shall have liberty* in seasonable times, to hunt and fowl on the lands they hold, and on other lands not inclosed, and in like manner *to fish in all boatable and other waters* (not private property) under proper regulations, to be made and provided by the General Assembly.

(Emphasis added.)[2] Although § 67 has no direct application here, it underscores the early emphasis placed upon the public interest in Vermont's navigable waters.

In 1918, this Court considered a miller's claimed right to raise and lower the level of Lake Morey by a few inches, an activity that the miller and his predecessors had been carrying out for one hundred and twenty years. See *Hazen*, 92 Vt. at 416–17, 105 A. at 250. The miller accomplished these manipulations by altering a dam constructed by the state with legislative authority. After concluding that the waters of Lake Morey were boatable as a matter of law, the Court stated:

> Being public waters according to the test afforded by the Constitution, the grants of land bounding upon the lake pass title only to the water's edge, or to low-water mark if there be a definite low-water line. The bed or soil of such boatable lakes in this State is held by the people in their character as sovereign in trust for public uses for which they are adapted. The [miller] did not, therefore, acquire any title to the waters of the lake, as such, nor to the lands covered by such waters, by grants from private sources. And the General Assembly cannot grant to private persons for private purposes, the right to control the height of the water of the lake . . . for such a grant would not be consistent with the exercise of that trust which requires the State to preserve such waters for the common and public use of

---

[2] In *New England Trout & Salmon Club v. Mather*, 68 Vt. 338, 35 A. 323 (1895), this Court held that the parenthetical phrase "not private property" modifies "other waters" and not "boatable" waters. *Id.* at 344–45, 35 A. at 325.

all. The General Assembly being powerless to make such a grant, none can be intended as the basis of the decree.

*Id.* at 419–20, 105 A. at 251 (citations omitted). Thus, while *Hazen* involved a claim of right to manipulate water levels rather than a claim of title, the case stands for the proposition that the legislature cannot grant rights in public trust property for private purposes. In several other cases, this Court has invoked the public trust doctrine in rejecting claims of private rights with respect to public waters. See *In re Lake Seymour*, 117 Vt. 367, 375, 91 A.2d 813, 818 (1952) (no right to control water level of lake can be acquired by or granted to private persons for private purposes); *State v. Malmquist*, 114 Vt. 96, 106, 40 A.2d 534, 540 (1944) (same); and *State v. Quattropani*, 99 Vt. 360, 366, 133 A. 352, 355 (1926) (doctrine bars littoral owner's claim of right to boat on public reservoir).

## III.

It is against this legal and historical backdrop that we must judge CVR's assertion of title to the waterfront area at issue. The primary grounds for the railroad's claim lie in the provisions of two nineteenth-century legislative acts. The first, enacted in 1827, provides, in pertinent part:

> That each and every person owning lands adjoining lake Champlain, within this state, be . . . fully authorised and empowered to erect any wharf or wharves, store-house or store-houses, and to extend the same . . . into lake Champlain, to any distance they may choose within this state.
>
> . . . .
>
> *Provided also*, That such wharf or wharves, store-house or store-houses shall not be extended so far into said lake as to impede the ordinary navigation in passing up and down said lake . . . .
>
> . . . .
>
> That each and every person or persons, their heirs or assigns, shall have the exclusive privilege of the use, benefit and control of any wharf or wharves, store-house or store-

houses, forever, which may hereafter be erected in said lake, agreeably to the provisions of this act.

1827, No. 38, §§ 1, 3.

The railroad also cites the provisions of legislation enacted in 1874, which provides:

> Whenever any railroad company in this state shall have constructed their railroad beyond low water mark into Lake Champlain, or shall have built out into said lake any wharf, dock, pier or other structure in connection with such railroad, for its accommodation or use, which shall not impede ordinary navigation in passing up and down said lake, such building and structures are hereby declared to be lawful, and the legal title thereto is hereby confirmed to such railroad companies respectively, which built the same, or others lawfully claiming through them.

1874, No. 85, § 1. Contending that the 1874 Act is unequivocal as to ownership of the filled lands, CVR maintains that the trial court erred in holding that the railroad's title remains impressed with the public trust. We disagree.

██ We begin by observing that the public trust doctrine, particularly as it has developed in Vermont, raises significant doubts regarding legislative power to grant title to the lakebed free of the trust.[3] As the Supreme Court of California has stated:

> [T]he core of the public trust doctrine is the state's authority as sovereign to exercise a continuous supervision and control over the navigable waters of the state and the lands underlying those waters. . . . The corollary rule which evolved in tideland and lakeshore cases bar[s] conveyance of rights free of the trust except to serve trust purposes . . . . [P]arties acquiring rights in trust property generally hold those rights subject to the trust, and can assert no vested right to use those rights in a manner harmful to the trust.

---

[3] The grant at issue here does not directly violate the rule enunciated in *Hazen* and our other cases because the grant was made for public, not private, purposes.

*National Audubon Society,* 33 Cal. 3d at 425–26, 437, 658 P.2d at 712, 721, 189 Cal. Rptr. at 349, 358. This rule obtains because the state's power to supervise trust property in perpetuity is coupled with the ineluctable duty to exercise this power. See *id.* at 437, 658 P.2d at 721, 189 Cal. Rptr. at 358. In the landmark case of *Illinois Central Railroad,* 146 U.S. 387, the United States Supreme Court declared:

> The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and the soils under them, so as to leave them entirely under the use and control of private parties, . . . than it can abdicate its police powers in the administration of government and the preservation of the peace. In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the State the right to revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes. So with trusts connected with public property, or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the State.

*Id.* at 453–54.

Citing dicta in *Illinois Central,* CVR argues that there are limited exceptions to the rule against alienation of trust property. *Illinois Central* involved a legislative grant to a railroad company, purportedly transferring title to the entire lakebed underlying the city of Chicago's harbor. The Court held that the grant was void on delegation grounds, observing that:

> The legislature could not give away nor sell the discretion of its successors in respect to matters, the government of which, from the very nature of things, must vary with varying circumstances. The legislation which may be needed one day for the harbor may be different from the legislation that may be required at another day. Every legislature must, at the time of its existence, exercise the power of the State in the execution of the trust devolved upon it.

*Id.* at 460.[4]

In a preliminary discussion of the public trust doctrine, the Court noted the existence in "the adjudged cases" of two exceptions to the general rule against legislative alienation of trust property: grants of submerged parcels for purposes of aiding commerce or promoting the public interest and "grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining." *Id.* at 452. The first of these exceptions—which have never been espoused by this Court—does not provide guidance in situations where a grantee later seeks to abandon the public purpose for which the grant was made. CVR urges that the second exception establishes that grants of public trust property can sometimes be made totally free of the trust; the State, on the other hand, argues that an unqualified grant of the lands at issue here would substantially impair the public interest in the lands and waters remaining.[5]

██ We need not resolve this fundamental question of legislative power, however, because we hold that the legislature did not intend to grant the lands at issue free from the public trust. "[S]tatutes purporting to abandon the public trust are to be strictly construed; the intent to abandon must be clearly expressed or necessarily implied; and if any interpretation of the statute is reasonably possible which would retain the public's interest in tidelands, the court must give the statute such an interpretation." *City of Berkeley v. Superior Court of Alameda*

---

[4] If CVR's interpretation of the wharfing statutes here were adopted by this Court, then the 1827 legislature would have delegated, beyond the power of all subsequent legislatures, control of over a mile of submerged lands lying along the shore of central Burlington Harbor.

[5] These exceptions have not been widely discussed in modern cases. In *City of Berkeley v. Superior Court of Alameda County*, 26 Cal. 3d 515, 606 P.2d 362, 162 Cal. Rptr. 327, *cert. denied*, 449 U.S. 840 (1980), however, the Supreme Court of California opined that the meaning of the second exception is not clear, noting that the *Illinois Central* court "may have had in mind either former navigable waters which had been filled and were thus no longer useful for navigation, or shoals and swamp lands." *Id.* at 522 n.6, 606 P.2d at 365 n.6, 162 Cal. Rptr. at 330 n.6. Under the California approach, grantees may acquire unrestricted rights in trust property only in rare instances. See, e.g., *National Audubon Society*, 33 Cal. 3d at 440, 658 P.2d at 723, 189 Cal. Rptr. at 360.

County, 26 Cal. 3d 515, 528, 606 P.2d 362, 369, 162 Cal. Rptr. 327, 334, *cert. denied*, 449 U.S. 840 (1980). As this Court observed in *Hazen*, "general words used in a statute will not apply to a state to the detriment of sovereign rights or interests unless such an intent clearly appears from the language used . . . ." *Hazen*, 92 Vt. at 420, 105 A. at 251.[6]

First, we note that neither the 1827 Act nor the 1874 Act contains a clear expression of an intent to abandon the public trust interest in the lands covered by the wharves. The earlier statute gave littoral owners the right to create the wharves, and it granted "the exclusive privilege of the use, benefit and control" of those wharves to the persons who created them and "their heirs or assigns . . . forever." CVR contends that the words "heirs and assigns . . . forever" evince a legislative intent to grant a fee simple absolute in the lands now at issue. But these words do not refer to the submerged lands, or even to ownership of the wharves themselves; instead, they refer only to the privilege of using and controlling the wharves.[7]

The 1874 Act comes no closer than the 1827 Act to an expression of legislative intent to abandon the public trust. To the extent that the language of the Act provides any guidance on this question, it implies that the legislature meant to ensure *preservation* of the trust: the Act confirms only "legal title" in the railroads, and this term is common parlance in the law of trusts. See *Noyes v. Noyes*, 110 Vt. 511, 520, 9 A.2d 123, 128 (1939); *City of St. Albans v. Avery*, 95 Vt. 249, 253–54, 114 A. 31, 33 (1921). The use of the term here suggests, if anything, legisla-

---

[6] CVR argues that general rules of construction are inapplicable here because 12 V.S.A. § 4983 establishes specific grounds for forfeiture of a state grant. Section 4983 provides that "[g]rants may be adjudged forfeited for the nonperformance of a condition annexed to or contained in such grant, whether expressed, or from the nature of the grant, clearly implied." But we are not determining here whether CVR has forfeited its grant; instead, we are determining the nature and extent of that grant.

[7] CVR cites cases from other jurisdictions in support of the proposition that fee simple absolute title passed to the railroad's predecessors immediately upon their filling of the submerged lands in accordance with the statutory provisions. If this were true, however, then the littoral owners would have been free to use their wharves for private purposes as soon as they were created, and such a construction of the Act would frustrate the manifest legislative intent.

tive acknowledgement that beneficial title to the lands at issue was vested in the public.

Moreover, the historical context of the 1874 enactment is significant. In 1872, this Court considered a case in which a railroad company had filled submerged lands in Lake Champlain along shoreline that it did not own. See *Austin v. Rutland Railroad*, 45 Vt. 215 (1873). While the railroad's rights to the filled lands were not directly at issue, the Court implied that the true littoral owner might have a legal remedy against the railroad. *Id.* at 244. Thus, it appears that the subsequent 1874 Act was intended to address this specific conflict between private parties rather than any question involving the public trust. Cf. *Boston Waterfront*, 378 Mass. at 649, 393 N.E.2d at 367 (distinguishing between the allocation of property rights among private individuals and situations involving public trust resources).

Nor do we find that an intention to abandon the public trust is necessarily implicit in either of the acts before us. The 1827 Act can be read as a simple grant of wharfing rights and privileges, while the 1874 Act actually employs the language of trust law. Neither of these enactments is inconsistent with a continuing adherence to public trust responsibilities on the part of the legislature.

The Supreme Judicial Court of Massachusetts was recently confronted with a strikingly similar factual situation. See *Boston Waterfront*, 378 Mass. at 630–37, 393 N.E.2d at 357–61. There, a series of early nineteenth-century wharfing statutes had granted a wharf company the right to construct wharves into Boston Harbor and to hold them in fee simple. In recent years, a development corporation obtained the rights to these wharves and sought to register and confirm title to the lands beneath them. After an exhaustive review of the public trust doctrine, the court held that the development corporation had title to the property in fee simple, "but subject to the condition subsequent that it be used for the public purpose for which it was granted." *Id.* at 649, 393 N.E.2d at 367. In discussing the legislative intent underlying the wharfing statutes, the court observed that:

> At that time, it was probably inconceivable to the men who sat in the Legislature . . . that the harbor would ever cease to be much used for commercial shipping, or that a wharf might be more profitable as a foundation for private condominiums and pleasure boats than as a facility serving public needs of commerce and trade. They did not speculate on what should become of the land granted to private proprietors to further development of maritime commerce if that very commerce should cease, because they did not envision it.

*Id.* at 648, 393 N.E.2d at 366. It is unlikely that the drafters of Vermont's 1827 Act were any more farsighted than Massachusetts' nineteenth-century legislators in this regard. With respect to the subsequent 1874 Act, which related to wharfs built for railroads, it seems equally improbable that the lawmakers of that era could have imagined that the newly-laid rails would ever fall into disuse.

■ We are bound to interpret these enactments, if reasonably possible, to preserve the public's rights in the trust property. See *City of Berkeley*, 26 Cal. 3d at 528, 606 P.2d at 369, 162 Cal. Rptr. at 334. Therefore, we conclude that the legislature did not intend, through the provisions of either act, to grant a fee simple absolute in the lands at issue.

## IV.

The exact nature of CVR's interest in the filled lands must still be determined. The State argues that the railroad's predecessors were granted only a franchise or an easement in the lands and that the grant was for an indefinite period of time. In support of this contention, the State cites *State v. Forehand*, 67 N.C. App. 148, 151, 312 S.E.2d 247, 249 (1984), in which the court held that a grant of submerged lands for wharf purposes "merely conveyed an appurtenant easement to erect wharves to the riparian owner."

Given the language of the two acts here, however, a similar interpretation cannot be sustained. First, the 1827 Act expressly states that the subject rights were granted "forever." While this word does not render the grant unconditional, it

surely makes its duration something more than indefinite. Second, although the 1874 Act's confirmation of "legal title" to the filled lands would not necessarily be inconsistent with the grant of a franchise or an easement, it appears to connote some greater right.

Nor does this Court's obligation to construe the acts to preserve the public trust mean that we are required to characterize them as grants of easements or franchises. As we have already observed, after considering the similar grants at issue in *Boston Waterfront*, the Supreme Judicial Court of Massachusetts concluded that they were intended by that state's legislature to convey fee simple title, but subject to the condition subsequent that the property be used for the public purpose for which it was granted. *Boston Waterfront*, 378 Mass. at 649, 393 N.E.2d at 367. We believe that such an interpretation here gives full effect to the words of the legislature while ensuring that its underlying intent to preserve the public trust is uncompromised.

 Accordingly, we hold that CVR has a fee simple in the filled lands subject to the condition subsequent that the lands be used for railroad, wharf, or storage purposes. This means that the State has the right of re-entry in the event that the condition is breached by the railroad.[8] See *Collette v. Town of Charlotte*, 114 Vt. 357, 360, 45 A.2d 203, 205 (1946).

CVR notes that, under 12 V.S.A. § 4983, a condition must be clearly implied by the nature of the grant it qualifies in order to support forfeiture for nonperformance of that condition.[9] As the foregoing discussion suggests, we conclude that a condition subsequent regarding use of the property is clearly implied by the nature and the subject matter of the two acts. Although conditions subsequent are not favored in the law, *Queen City Park Ass'n v. Gale*, 110 Vt. 110, 116, 3 A.2d 529, 531 (1938), the

---

[8] The State and City appear to argue that the condition subsequent has already been breached through CVR's declining use of the filled lands. On the basis of the record before us, we decline to so hold.

[9] "Grants may be adjudged forfeited for the nonperformance of a condition annexed to or contained in such grant, whether expressed, or from the nature of the grant, clearly implied." 12 V.S.A. § 4983.

public's sui generis interest in trust property "transcends the ordinary rules of property law." *Boston Waterfront,* 378 Mass. at 650, 393 N.E.2d at 367. Because we must interpret the acts reasonably to preserve the public's rights in the trust property, we do not hesitate to infer a condition subsequent here.[10]

## V.

■ Thus, the trial court was correct in concluding that the railroad's title is impressed with the public trust. The court prefaced this conclusion, however, by citing a number of cases from other jurisdictions that, in the aggregate, endorsed a wide variety of uses for land held under the public trust. The court stated that all of these uses—including restaurants, hotels, and shopping malls—were "examples of appropriate public uses that are encompassed by the contemporary public trust doctrine." Although the court retained jurisdiction to resolve disputes over proposed uses of the filled lands, it effectively gave CVR and its successors the right to choose among the listed uses for the property. On cross-appeal, the State and the City argue that this was erroneous, and we agree.

■ ■ Lands held subject to the public trust may be used only for purposes approved by the legislature as public uses. See *Boston Waterfront,* 378 Mass. at 648–49, 393 N.E.2d at 366–67. Any substantial change in the filled lands must therefore be consistent with a legislative grant or mandate, subject to judicial review, and this legislative control cannot be delegated to others.[11] See *Vermont Department of Public Service v. Massachusetts Municipal Wholesale Electric Co.,* 151 Vt. 73, 81, 558 A.2d 215, 220 (1988).

---

[10] The City argues that if this Court does not hold that CVR's title is conditional, with a right of re-entry in the State, then the Court should order that the public retains easements through the filled lands for purposes of fishing, fowling, navigation, and recreation in and upon the adjoining waters. We do not reach this argument.

[11] With respect to the railroad's related argument as to the efficacy of zoning regulations and Act 250 requirements, we add the observation that neither form of regulation is designed to determine an appropriate public use for trust property.

## VI.

Because the railroad and its predecessors have occupied the lands at issue for 140 years and because the City has taxed portions of these lands, CVR maintains that the trial court erred by refusing to invoke the doctrine of laches as a bar to the claims made by the City and the State. CVR also argues that the railroad has relied to its detriment on the past acts and statements of the State and that the State should therefore be estopped from asserting any interest in the property. We disagree on both counts.

Laches arises where a claimant fails to assert a right for an unreasonable and unexplained period of time and where the delay has been prejudicial to the adverse party; under these circumstances, enforcement of the right is held to be inequitable. *Stamato v. Quazzo*, 139 Vt. 155, 157, 423 A.2d 1201, 1203 (1980). The doctrine of equitable estoppel has a similar foundation in principles of fair play: the purpose of the doctrine is to prevent a party "'from asserting rights which may have existed against another party who in good faith has changed his or her position in reliance upon earlier representations.'" *Burlington Fire Fighter's Ass'n v. City of Burlington*, 149 Vt. 293, 298–99, 543 A.2d 686, 690 (1988) (quoting *Fisher v. Poole*, 142 Vt. 162, 168, 453 A.2d 408, 411 (1982)).

We hold that the claims asserted here cannot be barred through either laches or estoppel. As the Supreme Court of California has observed, the state acts as administrator of the public trust and has a continuing power that "extends to the revocation of previously granted rights or to the enforcement of the trust against lands long thought free of the trust." *National Audubon Society*, 33 Cal. 3d at 440, 658 P.2d at 723, 189 Cal. Rptr. at 360 (citation omitted). In *Thomas v. Sanders*, 65 Ohio App. 2d 5, 413 N.E.2d 1224 (1979), the court considered a claim that a railroad's continued payment of property taxes evinced state recognition of its ownership of trust property. The court rejected the contention, opining that "the state or city cannot relinquish [the public trust property] by acquiescence and estoppel does not apply." *Id.* at 15, 413 N.E.2d at 1231.

In any event, CVR could not prevail on either claim of error. Laches "'is so much a matter of discretion by the lower court that action by that court should not be disturbed unless clearly shown to be wrong.'" *Stamato v. Quazzo*, 139 Vt. at 157, 423 A.2d at 1203 (quoting *Laird Properties New England Land Syndicate v. Mad River Corp.*, 131 Vt. 268, 282, 305 A.2d 562, 570 (1973)). Here, CVR did not pursue plans to sell the filled lands until 1978. Whatever delay occurred in the subsequent assertion of the claims by the City and State was not great enough to establish that the trial court was clearly wrong in rejecting the laches argument. Furthermore, the doctrine of equitable estoppel is rarely invoked against the government, being allowed only where the injustice that would otherwise result is of sufficient magnitude to justify any effect that the estoppel would have upon public interest or policy. *Burlington Fire Fighters' Ass'n v. City of Burlington*, 149 Vt. at 299, 543 A.2d at 690. As a practical matter, this rule alone renders the doctrine of equitable estoppel inapplicable where the public trust is at stake. The trial court did not err in refusing to find either laches or estoppel.

## VII.

In sum, the trial court correctly concluded that CVR does not hold title to the filled lands free of the public trust. The court erred, however, by enumerating permissible future uses of the property and by retaining jurisdiction to resolve disputes regarding those future uses. Accordingly, we modify the trial court's order and affirm.

*Paragraph 4 of the trial court's declaratory judgment order, dated November 23, 1987, is modified to read as follows: "The filled lands that are shown on Attachments A1-A4 as being owned by Central Vermont Railway, Inc., are held by the railroad subject to the condition subsequent that they be used for railroad, wharf, or storage purposes. Central Vermont Railway may convey the filled lands subject to this condition." Paragraph 7 of the order is vacated.*