STATE OF VERMONT

SUPERIOR COURT                                    ENVIRONMENTAL DIVISION

|  |  |
|---|---|
| In re Omya Solid Waste Facility Final Certification | } |
| (Appeal of Shaw & Brod, formerly | } Docket No. 96-6-10 Vtec |
| Appeal of Residents Concerned about Omya) | } |

## Decision and Order on Motion for Summary Judgment

Original Appellant Residents Concerned about Omya appealed from a decision of the ANR to grant final certification to Omya, Inc.'s lined tailings management solid waste disposal facility (TMF) at its Verpol Site in the village of Florence, in the town of Pittsford, Vermont. In a separate decision also issued today in both this appeal and Docket No. 273-11-08 Vtec, Susan Shaw and Ernest Brod were granted leave to intervene; the original Appellant—Residents Concerned about Omya (RCO)—was dismissed; and Intervenors Susan Shaw and Ernest Brod were granted leave to continue with the appeal in place of RCO, but not to file any new issues in the Statement of Questions nor to file any additional memoranda on the pending motion for summary judgment.

Intervenors Susan Shaw and Ernest Brod are now represented by Sheryl Dickey, Esq., of the Environmental Law Clinic of the Vermont Law School. Appellee-Applicant Omya, Inc. (Applicant or Omya) is represented by Edward V. Schwiebert, Esq., and Hans Huessy, Esq. The Vermont Agency of Natural Resources (ANR) is represented by Catherine Gjessing, Esq. and Matthew Chapman, Esq. Amicus curiae Vermont Natural Resources Council (VNRC) is now represented by Jamie Fidel, Esq.

1

Procedural History and Factual Background

The procedural history and factual background is repeated here from this Court's November 16, 2010 decision and from the related decision issued today only as necessary to address the pending motion for summary judgment.

Applicant owns and operates a calcium carbonate processing facility, referred to as the Verpol site, at which it produces calcium carbonate by grinding up and processing marble. The tailings or waste products of this process have historically been placed in unlined disposal pits, referred to in the certifications as Tailings Management Areas (TMAs). Groundwater beneath the Verpol site itself contains aminoethylethanolamine, a residual chemical component of the flotation agent used by Omya in its processing operations, as well as containing elevated concentrations of the elements iron, manganese, and arsenic. In some tests of off-site groundwater, iron and manganese have been detected at concentrations in excess of secondary groundwater standards, although such concentrations are similar to those typically found in area groundwater. Aminoethylethanolamine and arsenic have not been detected in excess of groundwater standards beyond the boundary of the Verpol site. Extensive facts and studies have been developed by the parties regarding the monitoring, chemistry, and risk assessment for these substances in groundwater. If the present motion for summary judgment turned on these facts, summary judgment would have to be denied and this matter would have to be set for trial, as some of these facts are disputed. However, these facts are not required to resolve the motion before the Court in this decision.

Intervenors are residents in the vicinity of the Omya Verpol Site who are concerned about the potential for groundwater contamination from the construction and operation of the lined Tailings Management Facility, including the way in which the former unlined TMAs are being managed in connection with the development of the Tailings Management Facility.

On October 21, 2008, the ANR issued an interim certification for Omya's unlined TMAs; the interim certification expired by its terms on October 21, 2010. The interim certification was the subject of Docket No. 273-11-08 Vtec, which has been dismissed as moot in a related decision issued today.

On May 8, 2009, Applicant applied for 5-year final certification of its proposed lined tailings disposal facility. On May 6, 2010, the ANR approved final certification of the proposed facility, and, in mid-October, 2010, approved an amendment to the final certification. The parties agreed that the amendment should be considered within the existing final certification appeal. The final certification, as amended, is the subject of the present appeal.

Statutory and Common Law Context

Both the statutory and the common law governing groundwater in Vermont have developed over time. It is necessary to understand that development to place the newest development—the public trust statute at issue in this appeal, 10 V.S.A. § 1390(5)—in its proper context.

The final certification at issue in the present appeal is issued under Vermont's Solid Waste Management statute, 10 V.S.A. ch. 159, and the Vermont Solid Waste Management Rules (VSWM Rules). Both the statute and the rules require protection of groundwater in certifying disposal facilities in general. The statute states that the "certification for a solid waste management facility, where appropriate," shall "contain such additional conditions . . . as the Secretary shall deem necessary to preserve and protect the . . . groundwater . . . quality." 10 V.S.A. § 6605(b)(6). And see 10 V.S.A. §§ 6605(b)(5); VSWM Rules § 6-603(3) ("facilities shall be designed to protect . . . groundwater, . . . and to detect . . . the emission or discharge of contaminants from the facility to . . . groundwater"). The 2006 amendments to the VSWM Rules added a subchapter 13, specifically regulating the management of

mining and mineral processing waste, that requires the facility to be managed "such that an emission or discharge from the facility will not unduly harm the public health and will have the least possible reasonable impact on the environment."

Prior to the adoption of 10 V.S.A. § 1410 in 1985, the common law of groundwater in Vermont, governing the rights of neighboring property owners, remained the absolute ownership doctrine of the English common law, largely due to the state of scientific knowledge about underground water in the eighteenth and nineteenth centuries, and the lack of evidence regarding changes to that science in cases brought in the twentieth century. In Chatfield v. Wilson, 28 Vt. 49 (1855) the Court described the state of knowledge about the behavior of groundwater at that time as follows:

> The laws of the existence of water under ground, and of its progress while there, are not uniform, and cannot be known with any degree of certainty, nor can its progress be regulated. It sometimes rises to a great height, and sometimes moves in collateral directions, by some secret influences beyond our comprehension.

> The secret, changeable, and uncontrollable character of underground water in its operations, is so diverse and uncertain that we cannot well subject it to the regulations of law, nor build upon it a system of rules, as is done in the case of surface streams.

A hundred and fifteen years later, the Court in Drinkwine v. State, 129 Vt. 152, 154–55 (1970) declined to change that doctrine to one of reasonable use, not because it found the science to be unchanged by that time, but because the plaintiffs had not even alleged facts in the complaint to establish a "causal relationship between the pumping from the artesian wells and the depletion of water from the plaintiffs' springs." Id. at 154.

By adopting 10 V.S.A. § 1410, entitled "Groundwater; right of action" (with a semicolon separating the two clauses of the title), the 1985 legislature both established state policy with respect to the nature and science of groundwater and

4

replaced the common law absolute ownership doctrine with a more modern correlative rights doctrine for the purposes of determining liability for unreasonable harm affecting either the quality or the quantity of groundwater.

The 1985 statute, codified in 10 V.S.A. ch 48, also established the ANR's comprehensive groundwater management program "to protect the quality of groundwater resources." 10 V.S.A. §§ 1392–94. Section 1392(d) required the ANR to adopt the groundwater management strategy as a rule, "including groundwater classification and associated technical criteria and standards."

Prompted by problems experienced in Vermont with proposals for groundwater withdrawal in large quantities, the legislature again substantially revised the Vermont groundwater statutes in 2008, in a statute referred to by the parties as "Act 199" of 2008. It added a subchapter 6 to 10 V.S.A. ch. 48 (10 V.S.A. §§ 1416–1419), establishing a groundwater withdrawal permitting program, as well as enacting a temporary interim groundwater withdrawal permit process scheduled to expire on July 1, 2011. Importantly, the legislature in the same statute rewrote the policy section of 10 V.S.A. § 1390 to contain five specific policy declarations.

Section 1390(1) advises that the "state should adhere" to the groundwater management policy "as set forth" in § 1410. The policy set forth in § 1410 addresses both quantity and quality. Section 1390(2) states the importance of an adequate supply of groundwater for all uses, including domestic, agricultural, and industrial, and establishes the reasons for regulating the withdrawal of groundwater; it is primarily concerned with quantity. Section 1390(3) addresses the policy of the state to "protect its groundwater resources to maintain high quality drinking water"; this subsection is concerned only with quality, and only with drinking water. Section 1390(4) addresses the policy of the state that its "groundwater resources . . . be managed to minimize the risks of groundwater quality deterioration" by regulating human activities but balancing that policy with the needs of Vermont agriculture;

5

this section is also focused on quality rather than quantity.

Section 1390(5) contains three provisions. First, it states the clear policy, without referring to either quality or quantity, "that the groundwater resources of the state are held in trust for the public."

Second, § 1390(5) requires the state to "manage its groundwater resources in accordance with" three statutory sections, "for the benefit of citizens who hold and share rights in those waters." The three statutory references made in the second sentence of § 1390(5) are to all the policies expressed in 1390 as a whole; to the groundwater withdrawal permitting program of subchapter 6; and to the groundwater quality management program of § 1392.

Finally, § 1390(5) explains that the designation of the groundwater resources of the state as a public trust resource does not establish a broad new right of legal action by an individual; any new individual right of legal action, beyond the private right of action already provided by § 1410, must be for the purpose of remedying "injury to a particularized interest related to water quantity protected under" § 1390. It places no such restriction on the state's authority to enforce the public trust in groundwater established in § 1390(5).

Statutory Construction

In construing a statute, a court's "paramount goal is to discern and implement the intent of the legislature." Miller v. Miller, 2005 VT 89, ¶ 14, 178 Vt. 273 (citing Colwell v. Allstate Ins. Co., 2003 VT 5, ¶ 7, 175 Vt. 61); and see Trickett v. Ochs, 2003 VT 91, ¶ 22 (court's "foremost obligation when interpreting a statute is to ascertain and implement the underlying legislative intent"). In order to accomplish this, courts must "rely principally on the plain meaning of the statute" if it can be ascertained. In re Paynter 2-Lot Subdivision, 2010 VT 28, ¶ 6 (mem.) (citing In re D'Antonio, 2007 VT 100, ¶ 7, 182 Vt. 599).

6

Importantly, courts must "presume that the legislature does not enact meaningless legislation, and that it chooses its language advisedly so as not to create surplusage." Loiselle v. Barsalow, 2006 VT 61, ¶ 16, 180 Vt. 531 (internal citations omitted). When, as in the present appeal, the statute at issue "is part of a larger statutory scheme," the Court must also "'read operative sections of [the] statutory scheme in context and the entire scheme in pari materia.'" Paynter, 2010 VT 28, ¶ 6 (quoting Cushion v. Dep't of PATH, 174 Vt. 475, 479 (2002) (mem.)).

Motion for Summary Judgment

The primary issue before the Court in the present motions is whether the public trust in groundwater established in the policy declaration of 10 V.S.A. § 1390(5) requires a public trust analysis with respect to groundwater quality issues in the present solid waste certification, and, if so, whether the analysis comprised in Findings O through Q of the final certification meets that requirement.

The Court notes that the validity of the ANR's 2005 Groundwater Protection Rule and Strategy is not before the Court in the present appeal. In any event, such a challenge to a regulation is not within this Court's jurisdiction. 3 V.S.A. § 807.

Groundwater as a Public Trust Resource in Vermont

It is not necessary to go beyond the plain meaning and structure of the state's groundwater statute, 10 V.S.A. ch. 48, reading the operative sections in context, to discern the legislative intent in adopting a public trust in groundwater. Nothing about the language or structure of that statute restricts the public trust to groundwater quantity alone. To the contrary, the second sentence of § 1390(5) explicitly mandates that the state manage its groundwater resources for the benefit of its citizens, both with regard to groundwater quantity and quality. With regard to groundwater quantity, § 1390(5) requires the state to manage its groundwater for

7

the benefit of its citizens in accordance with § 1390(1), § 1390(2), and §§ 1416–19. With regard to groundwater quality, § 1390(5) requires the state to manage its groundwater for the benefit of its citizens in accordance with § 1390(1), § 1390(3), § 1390(4), and § 1392. Groundwater must therefore be managed as a public trust resource with regard to the quality of groundwater as well as with regard to quantity.

The third sentence of § 1390(5) does not alter this analysis. That sentence limits any new individual right of legal action, beyond what was already provided in § 1410(c), to remedying injury to a "particularized interest related to water quantity protected" by the policy statements in § 1390 itself. It limits individual lawsuits citing the public trust doctrine and the other policies of § 1390 to those individuals whose water quantity is directly affected by violations of those policies; the private right of action established by § 1410(c) already provides a basis for other types of individual lawsuits. The third sentence of § 1390(5) simply reserves to the state the authority to enforce the policies of § 1390 on behalf of the state's citizens in general.

Public Trust Analysis

A public trust analysis is distinct from government regulation under the police power. The 2005 Groundwater Protection Rule and Strategy is a police power regulation, as is evident from its principle that "[g]roundwater is of critical importance to the State of Vermont and must be actively protected and managed in order to protect <u>public health and welfare</u>." § 12-302(1)(a) (emphasis added).

This distinction between the state's responsibility for a public trust resource and its police power was recognized by the Vermont Supreme Court in <u>State v. Central Vermont Railway, Inc.</u>, 153 Vt. 337 (1989), in which it noted that a state "can no more abdicate its trust over property in which the whole people are interested

[that is, public trust property] . . . than it can abdicate its police powers in the administration of government and the preservation of the peace." Id. at 349 (quoting Illinois Central Railroad v. Illinois, 146 U.S. 387, 453–54 (1892)). By its nature, the public trust imposes on the state a "special obligation to maintain the trust for the use and enjoyment of present and future generations." Arizona Ctr. for Law in the Public Interest v. Hassell, 172 Ariz. 356, 368, 837 P.2d 158, 170 (Ariz. Ct. App. 1991).

The Vermont Water Resources Board laid out the methodology for conducting a public trust analysis in In re Dean Leary, No. MLP-96-04-WB, Findings of Fact, Concl. of Law, and Order, at 17–20 (Vt. Water Res. Bd. Aug. 1, 1997). It requires the decisionmaker to determine what public trust uses are at issue, to determine if the proposal serves a public purpose, to determine the cumulative effects of the proposal on the public trust uses, and then to balance the beneficial and detrimental effects of the proposal.

Adequacy of Analysis in Final Certification

In Finding O of the final certification, the ANR determined that the proposed facility is located in a Class III groundwater area, that industrial and commercial uses of groundwater are "permissible uses" of Class III groundwater, that the proposed tailings management facility is an industrial use, and that "the activity certified herein" is "consistent with the [Class III] groundwater classification." In Finding P, the ANR stated that, pursuant to § 12-801 of the 2005 Groundwater Protection Rule and Strategy, the property line was the "point of compliance" for measuring the effect of the proposed facility on groundwater, and that the facility as proposed "will not cause an exceedance of any standard at the point of compliance." In Finding Q, the ANR concluded that, provided that Omya complies with Conditions 30 through 36 of the certification, dealing with monitoring and corrective action, the public trust requirements of 10 V.S.A. § 1390(5) have been satisfied.

Because the 2005 Groundwater Protection Rule and Strategy was issued under the police power of the state, and has not been amended since the legislature's declaration of groundwater as a public trust resource, the ANR's determination that the proposed facility meets the requirements of the 2005 Groundwater Protection Strategy and Regulation is not sufficient to carry out the state's duty under 10 V.S.A. § 1390(5).[1] Findings O through Q of the final certification therefore must be vacated and remanded for the ANR to carry out its public trust responsibility.

This decision does not predict or require that any substantive aspect of Omya's final certification be changed. This decision makes no factual findings at all about the effect of the proposed facility on groundwater. Rather, it simply requires that the ANR perform the additional level of public trust analysis required by 10 V.S.A. § 1390(5).

Although this appeal is <u>de novo</u>, the Court is required to apply the substantive standards that were applicable before the ANR. 10 V.S.A. § 8504(h). The Court's role is not to set policy for the ANR, just as its role in municipal appeals is not to set policy for the municipalities. <u>Chioffi v. Winooski Zoning Bd.</u>, 151 Vt. 9, 13 (1989). Therefore, it is for the ANR in the first instance, and not this Court, to determine how to incorporate the public trust groundwater analysis of § 1390(5) into its solid waste certification process, and how to address or revise Findings O through Q in light of that analysis.

---

[1] The Court recognizes the administrative difficulties, mentioned by Omya and the ANR, if a full-blown public trust analysis were to be required for every small underground discharge that might or might not affect groundwater. However, the Court has before it in this case only this final certification, and must rule on it according to the statutory requirements. It will be up to the ANR to determine how to resolve those administrative difficulties, and whether to adopt or amend regulations to incorporate presumptions of compliance for certain classes of underground waste disposal, or by establishing categorical or general permits, or by any other means.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that Findings O through Q of the final certification are hereby VACATED and the final certification is REMANDED to the ANR for it to perform a public trust analysis and to make such changes, if any, to Findings O through Q and to any other aspects of the final certification as may be warranted by that analysis. This decision concludes this appeal.

Done at Berlin, Vermont, this 28th day of February, 2011.

_____
Merideth Wright
Environmental Judge

11