STATE OF VERMONT

SUPERIOR COURT—ENVIRONMENTAL DIVISION

|  |  |
|---|---|
| In re Champlain Marina, Inc., Dock Expansion } | Docket No. 28-2-09 Vtec |
| } | (Appeal from ANR dock extension |
| } | decision) |

## Decision on the Merits

Champlain Marina, Inc. ("Applicant") wishes to extend one of its pre-existing water-borne docks that encroaches into the Spaulding Bay area of Lake Champlain in the Town of Colchester and to add additional finger docks to the new dock extension. To gain authority to do so, Applicant applied for an amendment to its public waters encroachment permit pursuant to Chapter 11 of Title 29 of the Vermont Statutes Annotated, which concerns the management of public lakes and ponds.[1] When the Vermont Agency of Natural Resources ("ANR") granted conditional approval of the proposed dock extension, a group of neighbors ("Appellants") filed a timely appeal of that decision.[2]

Applicant was assisted in this appeal by its attorney, Craig Weatherly, Esq. At the time of trial, ANR was represented by Cielo Marie Mendoza, Esq., who was assisted by ANR staff attorney Judith Dillon, Esq. The Vermont Natural Resources Board appeared through its staff counsel, John H. Hasen, Esq., but did not actively participate in these proceedings. Pursuant to a May 19, 2010 Entry Order, the Court authorized the Vermont Natural Resources Council ("VNRC") to intervene as an amicus curie ("friend of the court") in this appeal. VNRC was represented in these proceedings by David K. Mears, Esq., who was assisted by VNRC's staff counsel, Jon Groveman, Esq.

---

[1] Applicant also sought and received a determination from ANR that its proposed dock expansion would not have a detrimental impact upon the public's use of collective resources held in trust on behalf of the public, such as navigable waters. This legal analysis is commonly referred to as the Public Trust Doctrine; it is addressed in more detail in Part II of the Discussion section of this Decision.

[2] Originally, thirty-one individuals appealed the amended ANR encroachment permit. At the time of trial, twenty-six individual Neighbors remained as appellants in this proceeding. While these Neighbors initially represented themselves in this proceeding, they were represented at trial and during pre-trial motion practice by Stephen A. Reynes, Esq. The Neighbors represented by Attorney Reynes are Thomas A. and Margaret A. Battey; David R. Wood; Kenneth Brown; Marlene Williamson; Laurel Butler; Deborah Rabideau; Wes Weaver; Dennis Reichardt; Linda and Sam Jackman; Renae Hance; John P., Susan R., Lindsey, and John R. Louchheim; Kathryn J. and Stephen C. DePasquale, Jr.; Beverly I. and Gordon A. Watson; Bruce and Michelle Bouchard; Joseph H. Boyd; Ann Burzynski; Neil Metzner; Frank Shea; and Catherine Rush.

1

The parties filed fifteen motions prior to trial, including motions to dismiss parties or the legal issues presented, to resolve discovery disputes, for summary judgment, and to establish and challenge the participation by VNRC as an amicus curie. Our decisions and entry orders on these pre-trial motions narrowed the legal issues presented in this appeal[3] and defined the nature of the Appellants' status and standing to appeal.[4]

When private negotiations between the parties did not resolve their disputes, the Court conducted a site visit and de novo merits hearing. After the trial, parties sought permission to and did file proposed Findings of Fact and Conclusions of Law, which the Court found very helpful in its deliberations and drafting of this Decision.

Based upon the evidence admitted at trial, including that which was put into context by the site visit the Court conducted with the parties, the Court renders the following Findings of Fact and Conclusions of Law.

## Findings of Fact

1. Lake Champlain is the fresh water jewel of the states of Vermont, New York, and the Province of Quebec, Canada. The general public and visitors to each of the three jurisdictions it borders put the waters of Lake Champlain to a wide variety of uses, including fishing in all seasons, swimming, and boating (by motor, sail, oar, and paddle).

2. The Vermont shoreline of Lake Champlain runs from our northwestern boundary with Quebec, Canada, to the southern reaches of Addison County. This area contains many inlets and bays used to access the Lake. The evidence presented at trial represented that the Malletts Bay area of the Lake, located in the Town of Colchester ("Town"), hosts the busiest marinas and boating areas on the Lake within the State of Vermont. Malletts Bay is estimated to host 1,700 boat moorings and dock slips. The Court found these representations credible and convincing.

3. Malletts Bay is identified as the portion of Lake Champlain lying between the Lake's eastern-most shores in the Town of Colchester and the land peninsula known as Malletts Head. Common descriptions of Malletts Bay identify three separate areas: (1) Outer Malletts Bay,

---

[3] See Decision on Multiple Motions, filed July 31, 2009, which dismissed Questions 1, 2, and 3 of Appellants' Revised Statement of Questions filed on May 4, 2009. Another Entry Order, issued on May 19, 2010, dismissed Appellants' Question 11. Appellants subsequently voluntarily withdrew their Question 4, thereby leaving Questions 5 through 10 and 12 through 14 to be resolved by trial.

[4] See Decision on Multiple Motions, filed July 31, 2009, which clarified that Appellants had standing to appeal as individuals and that, even though they collectively identified themselves as "Save the Bay," they had not appealed as a single appellant under that group name.

which refers to the waters contained in the outer-most reaches of the Bay, between the tip of Malletts Head and the western-most outcropping of Colchester shoreland; (2) Inner Malletts Bay, which includes most of the Colchester shorelands within Malletts Bay, with the exception of Spaulding Bay; and (3) Spaulding Bay, which encompasses the waters and shoreland between the southeasterly shores of Malletts Head and another peninsula, known as Coates Island. See Appellants' Exhibit 3, which depicts the nautical mapping of this portion of Lake Champlain. The marina at issue in these proceedings is located in Spaulding Bay.

**I.    General Characteristics of Spaulding Bay.**

4.     Spaulding Bay may not be the busiest section of Malletts Bay, but it does host a large number of developments, including commercial marinas, private docks, residential shorelines, a girl scout camp, and some natural, undeveloped areas. Spaulding Bay also hosts what is estimated to be the busiest public boat launch in all of Vermont; this boat launch is managed and operated by the Vermont Department of Fish and Wildlife.

5.     Spaulding Bay is roughly shaped like three quarters of an oblong oval. Its shores, running from approximately 3:00 to 11:00, host the following developments or identified areas:

a. At approximately 3:00 to 4:00 is located Coates Island Marina, a separate marina not affiliated with Applicant. Coates Island Marina, Inc. owns, manages and rents an unspecified number of dock slips and several boat moorings. Coates' boat slips are located off of two docks, the longest of which extends about 400 feet into Spaulding Bay.

b. Next to Coates Island Marina is an undeveloped area of marsh and wetlands.

c. The public boat launch owned and operated by the Department of Fish and Wildlife is located at approximately 5:00. On its busiest days this public boat launch is used by up to 600 visiting boaters, making it the busiest public boat launch in Vermont. These facilities include two parallel docks that run in a general north/south direction on either side of the public launch and that extend into the Bay waters about 75 to 100 feet. There is also a public parking area for cars and boat trailers. Fishing is allowed in the vicinity of this public boat launch, but swimming is prohibited.

d. At approximately 6:00 are located the existing facilities of Champlain Marina, Inc. The individual components of Applicant's Marina are described in more detail below, beginning at ¶19.

e. At approximately 7:00 are located two smaller, single dock marinas, also not affiliated with Applicant.

f. A number of residential properties are located from about 7:30 to 9:00 along the southwest and westerly shore of Spaulding Bay. Most all of the appellants here

3

own and occupy properties in this residential area; not all residents in this neighborhood have chosen to participate as appellants in this appeal. Of the shoreline homes in this area, most have rear yards facing the Bay, most with manicured lawns that are mown to the water's edge, or to a beach area at the water's edge. Of the homes in this area, twenty-one have private docks of various lengths that serve one or more boats on the Bay. There are also three water-borne private swim rafts located along this shoreline. No other swim rafts were identified at trial within Spaulding Bay.

g. There are also several private water-borne moorings located in the vicinity of this westerly shoreline.

h. The remainder of the westerly shoreline of Spaulding Bay is adjacent to a generally undeveloped area of Malletts Head. There is no shoreline, per se, as the land rises steeply from the water along rock cliffs.

i. The Brown Ledge Girl Scout camp is located near the northerly tip of Malletts Head, above the northern reaches of the shoreline cliffs. Campers from this Scout Camp often swim, fish, and paddle in Spaulding Bay.

j. In addition, a seaplane take-off/landing area, approved by the Town, the state, and the Federal Aviation Administration ("FAA") is located within Spaulding Bay, measuring 300 feet wide and 4,000 feet long and located parallel to the westerly shoreline of the Bay. This area is principally used by Frank Shea and John Wilson and their invitees; Messrs. Shea and Wilson are area residents.

6. Two other large marinas are located just outside of Spaulding Bay. The Moorings Marina is located within Inner Malletts Bay, easterly of Coates Island; it was reported to contain 114 boat slips, although it appears from orthophotographic evidence that a large number of boats are moored on individual moorings in Inner Malletts Bay, perhaps in excess of 200, which may or may not be managed by The Moorings. (See Appellants' Exhibit 2.)

7. Marble Island Marina is located to the west of the Malletts Head peninsula; it hosts 140 dock slips, sixteen moorings, a breakwater, and a separate public fishing and service dock.

8. There are a total of eleven private marinas in all of Malletts Bay, nearly all of which offer services to the general public.

9. Most boats travel in a general north/south direction within Spaulding Bay.[5] While some trial testimony spoke to east/west navigation within Spaulding Bay by some small boats and kayaks, the vast majority of boaters do not use Spaulding Bay exclusively for their recreational activities, but as an access point for recreation in the other portions of Malletts Bay and the outer

---

[5] The more exact description of this direction is northeasterly to southwesterly. We use north/south as a general reference in this Decision for ease of reference, and to conform to the testimony offered by many witnesses at trial.

4

reaches of Lake Champlain. There are several exceptions to this general rule, including kayakers who travel along the western shorelines of Spaulding Bay.

10. When kayakers put in at the public boat launch they must paddle around the outer ends of the Champlain Marina docks to reach the westerly shoreline.

11. Kayakers try to avoid the open waters of Spaulding Bay, due to the wake created by boats travelling into and out of the Bay.

12. There are a fair number of boaters who do not travel outside of Spaulding Bay. It is not that they recreate within the Bay generally; many boaters who occupy boat dock slips never venture away from their dock slip, save for the seasonal rituals of putting their boats in the Bay each May and withdrawing their boats each September. Appellants referred to such boats as "floating camps." A majority of the boats in dock slips at Champlain Marina follow this practice and never leave their slips during the boating season.

13. Boat travel originates from Spaulding Bay in one of three ways: (1) via the public boat launch; (2) via rented dock slips at one of the various commercial or private docks within Spaulding Bay; or (3) via moorings within Spaulding Bay.

14. Boating activities from the public boat launch, marinas, and moorings in the southerly portion of Spaulding Bay can be very heavy during the summer months. Swimmers, shoreline fisherman, and paddlers are less likely to congregate in the southern portion of the Bay because of the heavy boat activity.

15. Of the 1,700 established boat slips and moorings in all of Malletts Bay, about 240 are located in Spaulding Bay. These estimates do not include the hundreds of visiting boaters that arrive during the busiest summer months.

16. Slip docks generally offer several advantages over individual moorings, both from the perspective of environmental impacts and efficiency of use for the boating public. Floating docks do just that: they float. They are collectively secured by tie-ins to the land-based dock and several pylons at the end of each dock finger.

17. Moorings are individually anchored to the Lake bottom beneath the water; as a boat is moved by wind and water current, the mooring anchors and connecting chains stir and shift the sediment at the bottom of the Lake.

18. Boats on docks are aligned in a more compact fashion; boats on moorings are more spaced out, based upon their length and the scope of the mooring line. Examples of the contrast between boats at docks and those on individual moorings is shown on Appellants' Exhibit 2

## II. Current Operations at Champlain Marina.

19. Applicant is a privately-held, for-profit Vermont corporation, first incorporated approximately twenty years ago, and established to operate Champlain Marina ("the Marina"). It is owned by forty individual shareholders, and the corporation has the authority to issue a total of fifty shares.

20. Applicant's Marina currently maintains two docks for boat slips that encroach into the waters of Spaulding Bay. The two docks are parallel to one another, with a third, much smaller dock in between the two slip docks; the internal dock is used for boat refueling and other marine services.

21. Each of the two slip docks has individual "finger" docks that allow boats to moor perpendicular to the main docks. This arrangement allows for 107 boats to moor in individual slips along the existing Marina docks.

22. Shareholders are entitled to first priority to seasonally rent a boat slip at the Marina. If a shareholder chooses to rent a boat slip, they may do so at a discounted rate (representing a shareholder dividend, when the corporation's financial position allows). In recent years, about thirty-four shareholders have rented Marina boat slips each season, thereby leaving approximately seventy-three slips available for rental by the general boating public, on either a seasonal or transient basis.

23. Applicant prefers to rent its boat slips on a seasonal basis. Thus, when Applicant is able to seasonally rent most of its remaining boat slips to members of the general public, a minority of slips are available for rental on a daily or weekly basis. However, when seasonally-rented slips are unused, and with the consent of the seasonal renter, Applicant also makes those slips available for rental on a daily or weekly basis.

24. While Applicant's shareholders have chosen to only rent thirty-four of the 107 boat slips available during the recent boating seasons, nearly all of the Marina slips have been occupied during nearly all of boating season. The remaining slips have been rented on a seasonal, weekly or daily basis to individual members of the general public.

6

25. The dock slips at Applicant's Marina available to the general public also allow for less congestion in Spaulding Bay, since a similar number of boats located on individual moorings would occupy much more of the Bay area. The Inner Malletts Bay area, as depicted in Appellants' Exhibit 2, provides an example of individual moorings occupying a much greater area than slip docks.

26. In addition to offering boat slips for seasonal rental, Applicant makes the following services available to its shareholders, slip renters, and the general public:

   a. motorized travel lift for launching boats;

   b. refueling for water-borne boats, at the service dock located between the two slip docks;

   c. fresh water supply and wastewater disposal, including sanitary pump-out of sewage holding tanks and depository facilities for recyclables;

   d. free dockage and discounted fuel for public services, such as those maintained by the Colchester Fire Department and Colchester Harbormaster;

   e. boat launching, hauling, and winter storage services (winter boat storage for about 200 boats is located on Applicant's land, adjacent to its docks);

   f. seasonal parking for over 200 vehicles and some daily summer parking and winter storage for trailers;

   g. marine store, where drink and food items are also offered for sale; and

   h. public showers, toilets, and telephones.

27. Applicant has established service manuals and procedures for the handling of hazardous materials, including gasoline, diesel, and motor oils; these procedures acknowledge the dangerousness of allowing such materials to come in contact with public waters. When refueling a boat, Marina employees require the boat owner or their designee to assist in the refueling procedure, so that someone familiar with the vessel assists with the on-board procedures. Marina employees operate the fuel pump.

28. No fuel spills of a magnitude requiring reporting to any governmental entity have been reported at the Marina in the last ten years. Applicant has nonetheless established fuel spill response procedures and has fuel collection cloths, mats, and booms in place in case of spills. Marina staff are trained in the use of these materials and have experience using them in the case of minor spills.

29.     The sewage pump-out is vacuum operated and delivers the wastewater to an on-site septic tank and leach field.  There was no evidence presented of land- or water-based spills from this waste disposal system, nor any reports of system failure.

30.     The two docks are aligned in a parallel, general north/south direction.  The easterly dock is about 515 feet long with twenty-six finger docks attached; the westerly dock is about 385 feet long with nineteen finger docks.  Because the westerly dock extends from an earthen pier that is just over 100 feet long, the two docks currently extend about the same distance into the public waters of Spaulding Bay.

31.     The service dock, located between the two slip docks and upon which the fuel service facilities are located, extends about forty-eight feet into the public waters.

32.     Each of the two slip docks is about eight feet wide; the existing finger docks attached to the slip docks are about four feet wide and twenty-four feet long.  The finger docks are spaced about twenty-four feet apart, so as to accommodate two boats between each set of finger docks, provided the boats each have a beam (width) of no more than ten to twelve feet.

33.     At the water-borne end of each slip dock is a twelve-foot wide dock, perpendicular to the main dock and extending thirty-two feet in each direction (seventy-two feet in total), thereby establishing a "T" at the end of each main dock to which additional boats may be moored.

34.     Water-borne fuel supply is in high demand at the Marina, especially during high use periods on the summer weekends and holidays.  During this time, boats moored at the various marinas, launched from the public boat launch, and simply visiting the Bay will queue up at the water-borne end of the Marina slip docks, waiting their turn to refuel.  Applicant provides a signaling for boats awaiting fuel through a marine radio frequency channel.  Queued boats awaiting refueling can number up to ten on the busiest of summer days.  During less busy days there is sometimes no need for boats to queue.

35.     Queued boats maintain their place by circling in the water, since it is difficult or impossible for water-borne boats to remain in a static location, even in calm waters.

36.     When boats are queued up for refueling, boaters navigating from the public boat launch to the westerly shoreline of Spaulding Bay must navigate around or between the circling boats awaiting fuel.  This practice has caused concern for some boaters, especially those in small boats, such as kayaks or canoes, and especially on busy summer weekends when the public boat launch and the refueling dock are very busy.

37. The congestion sometimes caused at the end of the Marina docks during busy weekends when more than a few boats are queued for refueling is aggravated by congestion at the public boat launch and the proximity of the Coates Island Marina facilities to the east. While these concerns were expressed by small boat owners and kayakers, there were no boating accidents or injuries caused by this boat traffic and queuing reported at trial.

38. The area available for boats to pass through after being launched from the public boat launch, at its most narrow point, measures about 170 feet in width. This narrowest width is between the easterly Marina slips and a land outcropping from Coates Island. The area available for boats from the public launch to pass thereafter widens, so that there is about 245 feet in width between the end of the easterly Marina slips and the closest point of the Coates Island Marina slips. After that, boats departing from the public boat launch are able to enter into the expanse of the outer portions of Spaulding Bay.

### III.    Current Environmental Impacts.

39. Some areas of Lake Champlain in general and Malletts Bay in particular evidence the detrimental effects of shoreland development and stormwater discharges. In fact, the area adjacent to the neighbors' shoreland beach areas sometimes experience water-borne, free-floating plant growth that inhibits recreational uses, including boating, swimming, and fishing. Some Appellants testified to a regular practice of raking or otherwise collecting water-borne vegetation so that their docks, beaches, and swimming rafts could be used.

40. The credible evidence presented at trial was that the boats docked at Applicant's Marina do not materially contribute to the excessive plant growth in Spaulding Bay.

41. Not all water-borne plant growth in a fresh water lake is detrimental or evidence of an unhealthy environment. In fact, the most credible evidence presented was that the sections of Spaulding Bay around and under Applicant's docks evidenced a healthy aquatic environment. One example of this evidence is the existence of subaquatic vegetation rooted in the lake bed that draws its nourishment from the underwater soils. This subaquatic vegetation also supports a variety of invertebrate life forms that provide food for small fish.

42. The presence of Applicant's existing slip docks (which have been in their current form for more than a decade) provides an historical experiment of their environmental impact, detrimental or otherwise. There was little credible evidence presented at trial of a material

9

detrimental environmental impact from the presence and use of Applicant's docks in this section of Spaulding Bay.

43.     In fact, one beneficial impact of Applicant's slip docks has been to provide shelter and screening for fish and other aquatic organisms.

44.     The Lake bottom in the vicinity of Applicant's docks consists of a dense earthen material, similar to composted soil.  This underwater soil composition is a further indication of a healthy local aquatic environment.

45.     There was no credible evidence presented that Applicant's existing docks and marina operations have adversely affected area wildlife habitat or shoreland vegetation.

**IV.     Proposed Dock Expansion.**

46.     Applicant proposes to attach a 177-foot extension to its westerly dock.  This dock extension will have finger docks attached to it perpendicularly, in a pattern so as to accommodate sixteen additional boats.

47.     The new slips created by the proposed dock extension will accommodate bigger (i.e., wider and longer) boats.  The finger docks will be four feet wide, thirty feet long, and spaced forty feet apart, so as to accommodate two boats of nearly twenty feet in width each, and forty feet in length, perhaps longer.

48.     The existing "T" at the end of the current dock will be removed and relocated to the end of the expanded dock, thereby allowing larger boats to moor at the end of the extended dock.

49.     As with the existing dock, the proposed dock extension will be a floating dock, anchored to pilings at the end of each finger dock.  The new dock extension will be constructed wholly on land; its construction will not cause the surrounding lakebed to be disturbed.  The docks will remain in the Bay for the off-season.

50.     Applicant has experienced increased demand, both from shareholders and members of the general public, for boat slips that can accommodate bigger boats, particularly boats of forty feet or more in length and having a wider beam.  Applicant agreed with Appellants' characterization of some of these boats as "floating camps" and opined that current market pressures have brought about a widening of boats, so as to accommodate more amenities (and wider boaters).  Most, although not all, of the larger boats in Applicant's current marina remain in the dock slips for the duration of the boating season.

10

51.     Appellants expressed reasonable concerns that if larger boats with deeper drafts were allowed to occupy Applicant's expanded dock slips, there could be a greater risk of disturbance of the Lake bottom in the vicinity of Applicant's docks.  However, the credible evidence presented showed that the wider-beamed boats, even those seventy feet or more in length, that Applicant anticipates will occupy its expanded dock slips, will tend to draw less than six feet of water.  A wider-beamed boat does not necessarily require more water draft; in fact, it might draw less water than a narrower-beamed boat of a similar length.  (See Applicant's Exhibit E.)

52.     Spaulding Bay has some shallow areas, especially near its shorelines, particularly the southwesterly shoreline that is part of the residential areas along the Bay.  However, the Bay waters are deeper near Applicant's Marina; nautical maps evidence depths near the Champlain and Coates Island Marinas of twenty-three feet or more.  (See Appellants' Exhibit 3.)

53.     The credible evidence presented showed that the sixteen additional boats that will be moored at the Marina's extended dock are unlikely to have deeper drafts than the boats currently moored at the Marina's existing docks.  No credible evidence was presented at trial that the drawing of water by the boats visiting the existing Marina docks has caused a material detrimental environmental impact.

54.     Neither the dock expansion, nor the sixteen additional boats to be hosted, will cause a disturbance or environmental impact in Spaulding Bay.  This estimated lack of adverse impact will be especially true if Applicant's expectation proves correct: that a majority of the additional boats will generally remain in their dock slips for the boating season, just as has historically been true for the boats located at the existing dock slips in Applicant's Marina.

## Discussion

Our analysis in this de novo appeal of Applicant's request for authority to further encroach into the public waters of Spaulding Bay is governed both by statutory and case law recognition of the Public Trust Doctrine, the foundation of which originates in both our state and federal constitutions.  We address these authorities separately due to their separate importance, even though there is much overlap in the method of our review.

**I.     Will the proposed dock expansion adversely affect the public good?**

When reviewing this application for an amendment to Applicant's public waters encroachment permit, we are reminded that water-borne development must be reviewed quite differently than land-based development, since the developer does not own the water on which it

11

proposes its development.  In fact, our laws recognize that water bodies such as Lake Champlain are held for the public good: "Lakes and ponds which are public waters of Vermont and the lands lying thereunder are a public trust, and it is the policy of the state that these waters and lands shall be managed to serve the public good . . . ."  29 V.S.A. § 401.

So much importance is placed upon protecting public water bodies and lands for the public good that the starting point of our analysis is the following statutory directive: that "no person shall encroach on any of those [public] waters and lands . . . without first" proving to the permit-granting authority that their planned encroachment will not adversely affect the public good.  29 V.S.A. §§ 403(a), 405(b).  Thankfully, we are provided standards for how to assess an encroachment's impact upon the public good: we are directed to "consider the effect of the proposed encroachment as well as the potential cumulative effect of existing encroachments on water quality, fish and wildlife habitat, aquatic and shoreline vegetation, navigation and other recreational and public uses, including fishing and swimming, consistency with the natural surroundings and consistency with . . . any applicable state plans."  29 V.S.A § 405(b).[6]

As noted above at footnote 3, the Questions remaining from Appellants' Revised Statement of Questions are Questions 5–10 and 12–14.  By their Questions 5 and 13, Appellants pose the general challenge of whether Applicant's proposed dock expansion and its cumulative effect with other developments/encroachments within Spaulding Bay will adversely impact the public good.  To answer those general Questions, we review the specific legal standards taken from 29 V.S.A. § 405(b) that are highlighted in Appellants' Questions 6–10 and 12.  For the reasons detailed below, we conclude that Applicant's dock expansion, as proposed, will not have a detrimental impact on the public good under the legal standards codified in 29 V.S.A. § 405(b).

We first wish to note an important procedural standard.  While our initial focus is on the legal questions that Appellants have preserved for our de novo review of the pending

---

[6]  Even though our review of the pending appeal is de novo, it is limited to the legal issues that have been specifically preserved for our review by Appellants in their Statement of Questions.  See V.R.E.C.P. 5(f), 10 V.S.A. § 8504(h).

Since Appellants' remaining Statement of Questions (listed above at footnote 3) raise nearly all of the legal standards listed in 29 V.S.A. § 405(b), we have quoted those standards in total here and will address them each below, with the exception of a portion of the final standard: "consistency with municipal shoreland zoning ordinances."  We have omitted that standard from our analysis since we have concluded that Appellants failed to present any factual allegations upon which we could determine that shoreland activities or development would be impacted by the proposed water-borne dock expansion; thus, we granted summary judgment to Applicants on Appellants' Question 11, which challenged the proposed dock expansion's conformance with Town of Colchester Zoning Ordinance § 7.03(F)(5).  In re Champlain Marina Dock Expansion, No. 28-2-09 Vtec, slip op. at 5 (Vt. Envtl. Ct. May 19, 2010) (Durkin, J.)

12

encroachment application, it is Applicant who bears the initial burden of production and the ultimate burden of persuasion. Within the context of a public waters encroachment application, the former Vermont Water Resources Board, the entity which had jurisdiction over such appeals prior to this Court, defined the respective burdens of proof as follows:

> The burden of proof consists of the burden of production and persuasion. Under the burden of production, there must be sufficient evidence for the Board to make positive findings with regard to the Project on the public good and public trust issues. Under the burden of persuasion, the Board must be persuaded, by a preponderance of the evidence, that the weight of the evidence is in favor of the Project, notwithstanding the evidence presented in opposition to the Project.

In re Dean Leary (Point Bay Marina, Inc.), No. MLP-96-04, Findings of Fact, Conclusions of Law and Order, at 10 (Vt. Water Res. Bd. Aug. 1, 1997). With this procedural standard in mind, we review the adequacy of the evidence presented by Applicant in relation to the remaining Questions posed by Appellants.

By their Question 6, Appellants challenge Applicant's contention that the proposed dock expansion, and the cumulative effect of encroachments into Spaulding Bay, will not have an adverse effect on water quality. We conclude that there will be no adverse effect on water quality attributable to the 177-foot dock extension, its adjoining finger docks, and the additional sixteen larger boats that will use the new dock slips. We approach this issue with caution, since the Court is aware that Lake Champlain in general and Malletts Bay in particular have already felt the adverse impact on impaired waters. See generally In re Stormwater NPDES Petition (Conservation Law Foundation Appeal), No 14-1-07 Vtec (Vt. Envtl. Ct. Aug 28, 2008) (Durkin, J.). However, even in light of this caution, the credible evidence presented directs us to conclude that the Marina dock expansion, as proposed, will not have an adverse impact on water quality.

The proposed docks will all be constructed on land and do no harm to the public waters during the construction process. Once installed, they will float upon the waters and not disturb the land beneath the waters. Additionally, the proposed additional docks will be managed by Applicant, whose staff has shown an environmental sensitivity during over a decade of operating the Marina. Most likely, the boats that will occupy these additional slip docks will remain in place for the boating season and will not operate in a manner that would adversely affect the waters. Applicant's evidence was not credibly refuted on this legal standard; we must therefore answer Appellants' Question 6 in Applicant's favor.

13

Similarly, in connection with Appellants' Question 7, the credible evidence convinces us that the proposed dock expansion, and the cumulative effect from encroachments into Spaulding Bay, will not have an adverse effect on fish and wildlife habitat. We are persuaded again by the evidence tending to show that Applicant's staff have operated its current 107-slip marina in an environmentally safe manner, showing respect to the surrounding fish and wildlife habitat. We recognize that the dock extensions and addition of sixteen large, wide-beamed boats to Applicant's Marina will contribute to the size and water-bound traffic in the Bay. But these increases in encroachments and boat traffic will be relatively small and have negligible impact upon the existing operations within the Bay. No credible evidence was presented of a detrimental impact, from current operations and anticipated future operations, on the nearby wetland and undeveloped areas to the east of Applicant's Marina. The most credible evidence also showed that the nearby fish and wildlife habitat, including that around and under Applicant's existing Marina, are currently healthy. While the dock extension, associated finger docks and boats moored to them will add another 200 feet to the existing encroachments into the Bay, we anticipate no adverse impacts to fish and wildlife habitat from the design or planned operation of these marina improvements. We therefore must answer Appellants' Question 7 in Applicant's favor.

Appellants' Question 8 asks whether the planned marina improvements will adversely impact aquatic and shoreline vegetation. We must answer this question in the negative as well. Trial evidence convincingly showed that aquatic vegetation around and under Applicant's existing docks and the area of its planned docks is healthy. The aquatic vegetation in the vicinity of Applicant's Marina tends to be root-bound to the soils under the water and not free-floating; it does not exhibit the invasiveness of the free-floating vegetation in the vicinity of the Neighbors' residences. No aquatic or shoreline vegetation will be disturbed by the dock expansion or by the additional boats that will use these new dock slips.

We find it important to repeat at this juncture that the marina improvements proposed are limited to the 177-foot dock extension, associated finger docks, and the sixteen boats that will use these dock expansions. No extension is proposed for the adjoining Marina dock to the east, where the Department of Fish and Wildlife public boat launch and associated public docks are located. Also, no expansion is proposed for the other services at Applicant's Marina. Thus, there is no additional potential source, beyond the proposed improvements, for adverse impacts

14

to fish and wildlife habitat or aquatic and shoreline vegetation proposed by this application. We do not anticipate adverse impacts to fish and wildlife habitat or aquatic and shoreline vegetation, particularly in light of the limited nature of this expanded encroachment.

Appellants' Question 9 expresses the concerns that Applicant's proposed marina improvements will adversely affect navigation and other recreational and public uses within Spaulding Bay, particularly since the dock "extension is designed for accommodation of large boats with deep drafts in a shallow, narrow bay, immediately adjacent to one of the State's largest and busiest public boat ramps, and where there already exists three marinas, a recreational camp for water-related activities, a sea plane base, and many private moorings and docks"[7] (Appellants' Revised Statement of Questions 3, filed May 4, 2009). We first note some inaccuracies in this Question. The credible evidence presented at trial tended to show that the larger boats (both by length and beam) that Applicant anticipates will use its proposed dock slips will not have materially deeper drafts than the boats that currently occupy its existing dock slips. (See Applicant's Exhibit E and Appellants' Exhibit 3.) The evidence also showed that the affected area of the Bay is neither shallow nor narrow. (Id.) For the reasons detailed below, we must also answer Question 9 in Applicant's favor.

While Applicant's docks are adjacent to the undisputed busiest public boat launch in the state, the planned dock expansion is farthest away from the public launch and will not narrow the area available to boaters who depart from that launch. The proposed improvements will not inhibit these boaters' abilities to safely traverse the Bay in a general north/south direction. Additionally, while the proposed dock extension and its use will increase the length of the westerly dock by nearly 200 feet, we conclude that this expansion (alone or when considered in conjunction will all Bay encroachments) will not adversely materially impact navigation for kayakers or other small boat operators in the Bay.

Most navigation in Spaulding Bay travels in a generally north/south direction; there was little evidence of kayakers or other small boaters regularly traversing the Bay in an east/west direction. Those that do must be careful, especially during busy summer weekends, as the wakes from larger boats can make east/west traversing more difficult. However, such traverses have a

---

[7] Most of Appellants' Questions in their Revised Statement of Questions use this same qualifying language, including reference to the adverse impacts of both the proposed dock expansion and the cumulative impact of all encroachments into the Bay. We have considered the full language of each of Appellants' Questions in each of our legal conclusions.

specific purpose in mind: to arrive at the westerly shores of the Bay and to travel up and down that shore, taking in the beauty of the neighborhood area and the undeveloped cliff section beyond. We received no credible evidence of kayakers, small boaters, or fisherman who desire to simply occupy the middle of the Bay beyond Applicant's docks. Those kayakers and small boaters that do traverse in front of Applicant's docks will now need to venture 200 additional feet into the Bay to pass the extended westerly dock, but we do not anticipate this action to be anything more than a minor and brief inconvenience.

The proposed dock extension did give the Court some initial concerns in regards to the queuing of boats awaiting refueling, but any Court concern was alleviated by Applicant's pledge to abide by recommendations from the Colchester Harbormaster, so that any possible interference with navigation will be addressed. We condition our approval of Applicant's encroachment application upon cooperation and compliance with the Harbormaster's recommendations.

Additionally, while the planned dock extension is nearest to the FAA-approved seaplane take-off/landing zone, the extension and its associated boat traffic will not encroach into or near the take-off/landing zone. Given that the FAA-approval does not isolate this area of the Bay for exclusive seaplane use, and that a condition of the FAA permit requires seaplane operators to give way to boating traffic, we see no adverse impacts upon seaplane use from the proposed dock expansion.

Applicant also proposed that its dock extension remain in the public waters during the winter months. Appellants assert that this practice will further inhibit winter navigation, since ice fisherman and others use the Bay area during the winter. We cannot agree with Appellants. Applicant's existing docks have not inhibited winter navigation; we cannot conclude that a 177-foot extension will create a new impediment, given the historical practice.

If Applicant was proposing sixteen or more individual moorings for large boats in the Bay area north of its docks, our determination here may have been different. But the credible evidence is that dock slips provide a compact area for boat mooring. The anticipated use of the proposed new boat slips (i.e., use by boats that will rarely sail away from the slips) will have no adverse impact upon area navigation, nor will the proposed dock expansion or its use contribute to a cumulative adverse impact upon navigation. We answer Question 9 in Applicant's favor.

16

Applicant's proposed dock expansion is entirely consistent with its natural surroundings;[8] we therefore conclude in Applicant's favor in regards to Appellants' Question 10 as well. This section of Malletts Bay and its surrounding sections serve as home for over 1,700 boat moorings, many of which are dock slips. On a beautiful, busy summer day, there are possibly several thousand other boating visitors to all areas of Malletts Bay. The proposed expansion of Applicant's public waters encroachment will bring sixteen additional boats to the Bay, most all of which will rarely leave their dock slips. While being in Spaulding Bay during one of these busy summer days will not be as tranquil as boating in the open Lake, the proposed dock extension and its sixteen additional large boats are unlikely to add materially to any navigation impediments experienced in the Bay.

Appellants' Question 12 seeks review of the conformance of Applicant's proposed dock extension with "applicable state plans." This Question is similar in concept to Appellants' former Question 11 concerning a provision of the Town of Colchester Zoning Ordinance, which Question was summarily decided by the Court in its Entry Order of May 19, 2010.[9] See In re Champlain Marina Dock Expansion, No. 28-2-09 Vtec, slip op. at 5 (Vt. Envtl. Ct. May 19, 2010) (Durkin, J.) For reasons similar to our summary judgment analysis of Question 11, we also answer Appellants' Question 12 in Applicant's favor.

We note that Applicants did not make the Court aware of a specific state plan to which we may refer in our analysis of their Question 12. Absent the general Public Trust Doctrine addressed below, we know of no "state plan" that should be considered in our review of Applicant's water-borne dock expansion. With no state plan to reference, we conclude that Applicant's proposed dock extension will not adversely impact any state plan.

Given these conclusions as to the specific legal standards of 29 V.S.A. § 405(b) that Appellants have preserved for our review in this appeal, we conclude that Applicant's proposed dock expansion, and the cumulative effect of encroachments into Spaulding Bay, will not adversely impact the public good and that the requested amendment to Applicant's public waters encroachment permit should issue pursuant to 29 V.S.A. § 403(a) and § 405.

---

[8] We consider each of the following components of Spaulding Bay to make up the natural surroundings that we must consider under 29 V.S.A. § 405(b): the public and private boating facilities, the residential development along its westerly shores, the Girl Scout Camp, and the undeveloped wetlands and cliff areas.

[9] See footnote 6, above.

## II.    Public Trust Doctrine

The importance of the general public's right to the use and enjoyment of public land and waters is recognized in our Constitution, Vt. Const., ch. II, § 67, but has origins that date back centuries.  See State v. Central Vt. Ry., Inc., 153 Vt. 337, 342 (1989) (referencing the public trust doctrine as "having its roots in the Justinian Institutes of Roman law.").  Lands submerged beneath navigable waters in our state have long been regarded as being held for the benefit of the general public, and "[t]itle to these [submerged] lands is deemed to be 'held in trust for the people of State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties.'" Central Vt. Ry., 153 Vt. at 341 (quoting Ill. Central R.R. v. Ill., 146 U.S. 387, 452 (1892)).  In the appeal at bar, it is agreed that the waters of Lake Champlain in general and Spaulding Bay in particular are subject to the Public Trust Doctrine.  We therefore must determine whether the proposed dock extension to Champlain Marina violates that Doctrine before concluding whether Applicant is entitled to the requested amendment to its encroachment permit.

Prior to the Permit Reform Act of 2004 that transferred jurisdiction over encroachment permits to this Court, the former Vermont Water Resources Board considered these appeals and applications.  While that Board no longer exists, and its successor—the Water Resources Panel of the Vermont Natural Resources Board—no longer is vested with appellate responsibilities, we are directed to give some weight and precedent to prior decisions of the Board, given its broad prior experience in these areas.  10 V.S.A. § 8504(m).  We therefore look to and rely upon the former Board and its decisions for guidance.

Fifteen years ago, the former Board was presented with several challenges by a Mr. Leary to the proposed expansion of water-borne docks at the Point Bay Marina, also located in the waters of Lake Champlain, but at a more southerly location in the Town of Charlotte.  In response to Mr. Leary's appeal, the former Board issued several decisions, findings, and legal conclusions during the period from 1994 through 1997.  Those decisions provide much guidance and historical perspective on the overlapping notions of the public good and the Public Trust Doctrine.

We have previously referenced the former Board's August 1, 1997 Findings, Conclusions and Order within our analysis of the impact of Applicant's proposed dock extension on the public good pursuant to 29 V.S.A. §§ 401–409.  By that 1997 decision, the former Board

ultimately approved Point Bay Marina's planned dock expansion. See In re Dean Leary (Point Bay Marina, Inc.), No. MLP-96-04, Findings of Fact, Conclusions of Law and Order (Vt. Water Res. Bd. Aug. 1, 1997).    In an earlier Memorandum of Decision, the former Board provided perspective and guidance on the appropriate review of such projects under the Public Trust Doctrine. See In re: Dean Leary (Appeal of DEC Permit No. 93-29 Point Bay Marina, Charlotte, Vermont), No. MLP-94-08, Mem. of Decision, at 4–5 (Vt. Water Res. Bd. Apr. 13, 1995).  The Board concluded that it had "a duty, independent of the public good determination under 29 V.S.A. § 405, to assure the protection of public trust uses" and stated the following:

> As a part of State government, the Board has a fiduciary obligation under the public trust doctrine to determine that encroachments will not have a detrimental effect on public trust uses. Hazen v. Perkins, 92 Vt. 414 (1918); State v. Malmcuist, 114 Vt. 96 (1944); In re Establishment of Water Levels of Lake Sevmour, 117 Vt. 367 (1952); State of Vermont v. Central Vermont Railway, Inc., 153 Vt. 337 (1989).  In making this determination, the Board may rely on the guidance provided by case law both from this jurisdiction and other jurisdictions recognizing the public trust doctrine.  In many instances, the uses identified in 29 V.S.A. § 405 are identical to the uses protected by the public trust.

Id. at 4–5.

While the protection of public trust uses is held in high regard, it does not act as an absolute barrier to private development or encroachment into public waters; the interest to be protected is the use, and not the public resource itself.  Re: Kent Pond (Vt. Dept. of Fish § Wildlife), Nos. MLP-03-10 and MLP-03-11 (Cons.), Findings of Fact, Conclusions of Law, and Order, at 12 (Vt. Water Res. Bd. May 12, 2004).  Once we have identified the public trust uses at issue in this appeal, we must balance the impact of the encroachment on public trust uses with the encroachment's public benefits.  Id. (citing Re: Killington, Ltd., Nos. MLP-97-09 and WQ-97-10, Findings of Fact, Conclusions of Law, and Order, at 55–57 (Vt. Water Res. Bd. Aug. 14, 1998)).

The parties here agree that the public trust uses at issue here relate to the ability to boat, fish, and swim in the waters of Spaulding Bay, as well as to ice fish and ice skate during the winter months.  The most active and frequent uses within the vicinity of the proposed dock expansion are public boating and kayaking; swimming, fishing, sea planing, and winter activities occur to a lesser extent, and to that extent outside the dock expansion areas.

We do not dispute that if no marinas were located in Spaulding Bay it would appear more tranquil, but we do not automatically equate tranquility in all public areas with encouragement of

their use by the public.  In fact, the absence of marina services in Spaulding Bay, including the additional docks planned by Applicant, would <u>discourage</u> use of the Bay by a significant number of the general public.  The presence of Champlain Marina and the other marinas in Spaulding Bay encourages and assists the use and enjoyment of the Bay by many members of the public.  While we recognize that unchecked marina expansion would frustrate public use and enjoyment, we cannot conclude that the 177-foot dock expansion and sixteen additional large boats will have a detrimental impact on the overall use of the Bay by members of the public.  We conclude that the dock expansion, as proposed, will have an overall beneficial impact on the public trust use of boating in the Bay by expanding its availability.  We also conclude that the cumulative beneficial impacts of Champlain Mariana and the other marinas in Spaulding Bay outweigh any possible detrimental impact on public boating, kayaking, and other public uses in the Bay.  We therefore conclude that Applicant's proposed dock expansion conforms to the Public Trust Doctrine.

### Conclusion

For all the reasons more fully discussed above, we conclude that Applicant's proposed expansion of its westerly dock that encroaches into the waters of Spaulding Bay in the Town of Colchester should be **APPROVED**, since as designed it will conform to the provisions of 29 V.S.A. §§ 401–409 and the Public Trust Doctrine.  To assure that the dock expansion does not adversely impact navigation in Bay waters, particularly when a number of boats have queued up for refueling at the end of its easterly dock, this approval is conditioned upon Applicant, and its successors and assigns, complying with the directives as to queuing and navigation by the Town of Colchester Harbormaster and his successors and assigns.

A Judgment Order accompanies this Decision on the Merits.  This completes the current proceedings before this Court concerning the pending application.

Done at Berlin, Vermont, this 10th day of January, 2011.


_____
Thomas S. Durkin, Environmental Judge

20