Filed 03/19/24

VERMONT SUPERIOR COURT
Environmental Division
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org



| Lake Rescue Encroachment Permit[1] (Application No. 2536-LEP) | No. 92-8-18 Vtec |
|---|---|

## DECISION ON THE MERITS

This appeal concerns the issuance by the Vermont Department of Environmental Conservation of Lake Encroachment Permit # 2536-LEP ("the LEP") to the Vermont Department of Fish and Wildlife, authorizing the installation of a floating dock at the DFW Lake Rescue fishing access area located at 22 Fishing Access Road, Ludlow, Vermont. Several individuals[2] owning properties along Lake Rescue ("the Lake"), as well as the Lake Rescue Association ("LRA"), (together "Appellants") timely appealed the permit to this Court.

### Background

We first wish to offer our sincere regrets for the length of time that this appeal has been pending before our Court. This appeal was first filed on August 30, 2018, by the Neighbors' original attorney, George T. McNaughton, Esq. The docket entries reflect that over the course of the next 36 months, the Court held numerous conferences with the parties in an effort to help prepare this matter for trial. Durling those 36 months, the parties engaged a mediator and expended considerable

---

[1] The application that is the subject of this appeal references the physical address as "Lake Rescue Boat Launch – Fishing access Road, Ludlow, Vermont." See Vermont Department of Fish and Wildlife (hereinafter "DFW") Exhibit 2a. However, during a conference with the Court on November 26, 2018, some of the parties suggested that the name of the aforementioned Lake was more commonly referred to as "Rescue Lake." Based upon these suggestions, the Court during that November 2018 conference changed the caption to "Rescue Lake."

The Court now realizes that that caption change was in error. All of the parties' post-trial filings, as well as the application that is the subject of this appeal, reference the name "Lake Rescue." The Court regrets this error and has now directed the change of the name referenced in the caption.

[2] The individuals who have appeared as Appellants are Susan Burlazzi, Katherine Haslam, Kenneth Haslam, Lisa Kaiman, Malcolm Kostuchenko, Joann Peters, and Bruce Zanca, hereinafter referred to as "Neighbors."

resources, all in an effort to reach a voluntary resolution of their disputes. During that time, the Court also addressed several pre-trial motions, including motions for summary judgment, to strike certain filings, in limine, and to stay these proceedings. Applicant also advised that it may amend its site plan and application, in an effort to respond to certain expressed concerns. When these efforts did not result in a resolution of all disputes, the Court requested that the parties provide a list of their unavailable dates for trial, expected to be held sometime during the months of October through December, 2021. However, due to the need for the Court to address all of the motions pending at that time, as well as the ongoing COVID Pandemic, the trial did not occur during that time. Once the remaining pre-trial motions were addressed by the Court, the parties provided the Court with revised lists of their unavailable dates for trial and the trial was rescheduled for April 25 and 26, 2022.

Unfortunately, Attorney McNaughton suddenly passed away on March 24, 2022. Attorney McNaughton's son, Attorney Ethan B. McNaughton, Esq. filed his limited appearance for Appellants; he also filed a motion for the final pre-trial conference and two-day trial to be continued. The Court granted that motion on April 14, 2022.

The parties then advised the Court that they were renewing their efforts to seek a voluntary resolution for their disputes. When those renewed efforts did not prove successful, Attorney Alexander J. LaRosa on July 26, 2022, entered his appearance for Appellants. The Court then requested that the parties resubmit their respective revised lists of unavailable dates for trial. After further conferences and pre-trial motion practice, the Court set the merits hearing to occur on June 6 and 7, 2023; the merits hearing was completed on the second scheduled day.

The Vermont Agency of Natural Resources, Department of Environmental Conservation ("DEC"), is represented in these proceedings by Attorney John Zakowski. The Vermont Agency of Natural Resources, Department of Fish and Wildlife ("DFW") is assisted in these proceedings by Attorney Catherine J. Gjessing.

During the course of the parties' pre-trial motion practice, the Court conducted a site visit on August 18, 2021. The site visit was helpful to the Court because it put into context the evidence to be presented at trial and the evidence relied upon in the presentations concerning the various pre-trial motions. Just prior to the June 2023 trial, the parties and the Court concluded that a second site visit was not necessary.

**Procedural Background**

In the Spring of 2020, a dispute arose amongst the parties regarding the appropriateness of DFW filing an amendment application to its encroachment permit, while this appeal was pending in

this Court, and without notice to the Court or the other parties. We addressed the unannounced permit amendment application, and the status of Appellants' pending appeal, in our June 9, 2021 Entry Order addressing the State's challenges to several of Appellants' Questions. *See* In re Rescue Lake Encroachment Permit, No. 92-8-18 Vtec at 16–19 (Vt. Super Ct. Envtl. Div. June 9, 2021) (Durkin, J.).

In the course of the dispute in 2020, and in response to DFW's unnoticed permit amendment application, Appellants filed their Supplemental Statement of Questions on May 12, 2020. Appellants did not change how many of their Question were worded from their original filing of September 7, 2018. However, Appellants supplemented their original Statement of Questions with additional Questions 18 through 22, inclusive. All of those additional Questions were dismissed by the Court in its June 9, 2021 Entry Order, except for Question 20, which the Court in that Entry Order directed that Question 20 be clarified. We address Appellants' revised Question 20, below.

As noted above, the parties filed several pre-trial motions which the Court addressed in turn. Most substantively, on June 9, 2021, the Court granted DFW's motion for summary judgment on some of the original 23 Questions Appellants filed on May 12, 2020. As a consequence of that Decision, the Court granted summary judgment for DFW on Questions 1, 2, 13, 18, 21, and 23; dismissed Questions 19 and 22, and directed Appellants to clarify their Questions 8, 16, and 20. Appellants thereafter filed their "Amended Supplemental Statement of Questions" on July 1, 2021.

The Court also issued other substantive decisions on pre-trial motions on January 13, 2022, and June 9, 2021 (as to mootness and a request to stay the proceedings). Nothing presented at trial convinced the Court to revisit any of its pretrial determinations. The Court therefore adopts all of those pre-trial determinations into this Merits Decision.

On August 30, 2021, the parties filed a Stipulation of their respective planned trial witnesses and expected evidence. In response, DFW filed a motion in limine to restrict certain witness testimony, portions of exhibits and reports that Appellants intended to present at trial. In response, the Court issued its January 13, 2022, decision which granted in part and denied in part DFW's limine request. These limitations were followed at trial.

Based upon the testimony and other evidence deemed credible by the Court, we render the following Findings of Fact, Conclusions of Law, and Judgment Order which accompanies this Decision.

**FINDINGS OF FACT**

## I.  Background and Surrounding Neighborhood

1.      Vermont Route 100 travels in a general north/south direction along the entire distance of our State, often meandering over or near the spine of the Green Mountains.  It travels through some of our State's most beautiful and scenic sections.  What often makes the travels along Route 100 so breathtaking are the streams, rivers, and lakes that it abuts during its travels.  In the Southern Vermont community of Ludlow, Route 100 follows along the Black River and the four lakes that the Black River feeds (Amherst Lake, Echo Lake, Lake Pauline, and Lake Rescue).

2.      Three of these four lakes have a DFW maintained public area at which individuals may access each lake by pedestrian travel, boat, or kayak.  It was undisputed at trial that Lake Rescue (and these other lakes as well) represent public waters of the State and are governed by regulations administered by DEC.

3.      For many years, there has been an access point on the easterly side of Lake Rescue.  The credible and uncontested testimony and written reports revealed that the Lake Rescue access area was first developed in the 1970s, on land that the State first acquired as two separate parcels in 1954.  These two combined parcels include a total of 150 feet of shoreline, 65 feet of which provides access to the Lake from the DFW fishing access area.

4.      This existing access area has a concrete pad that assists boaters wishing to launch a boat or kayak.  The existing access area does not include a dock.

5.      This access point is located off of Vermont Route 100, accessible by first travelling along Ellison's Lake Road that runs along the easterly shore of Lake Rescue, and then turning onto Fishing Access Road and following that road to the existing fishing access area.

6.      Lake Rescue encompasses about 184 acres in area, with many homes and seasonal camps on or near the Lake shore.  At its deepest point, located in the Main Lake section, the Lake is 90 feet or more deep.  Credible DFW testimony revealed that there are currently about 70 private docks located along Lake Rescue, ranging in length within the water from 25 feet to 50 or more feet.  DFW witness Dylan Smith credibly described the twelve or more private docks closest to the DFW access area.

7.      DFW maintains over 203 developed fishing access areas throughout Vermont, providing public access for shore fishing opportunities and launching of water craft.  The locations of these DFW maintained access areas are depicted in Figure 1 of DFW Exhibit 5, located at page 5.  Some of these fishing access areas have in-water docks that assist visitors who are attempting to launch their boats and kayaks, or to use for shoreline fishing; some areas do not have docks.  Figure 2 in DFW

Exhibit 5 (p. 6) identifies all access areas with a yellow pin; each of the access areas with a dock are identified with a small blue sailboat. These DFW managed docks number 40 or more; many (although not all) are designed to assist disabled individuals to use the docks to access the adjacent public waters.

8. As these Figures 1 and 2 from Exhibit 5 evidence, there are many more fishing access areas in the Northern part of our State than in the South. Further, many more of the Northern Vermont fishing access areas have docks than those that are in the South.

9. DFW has sought to improve some of its fishing access areas, so as to make them more accessible to disabled individuals. These efforts were prompted by the passage of the Federal American With Disabilities Act and the enactment in 2010 of subsequent regulations by the U.S. Department of Justice. Those regulations include the Standards for Accessible Design ("Standards") that established requirements for public recreational facilities. Those Standards require that all newly constructed public access facilities or those that receive significant upgrades must comply with the required Standards to ensure accessibility for all users, including disabled individuals.

10. Lake Rescue is an elongated water body; its southerly section is wider and sometimes referred to as the "Main Lake." Northerly of that section, the easterly and westerly shorelines come closer together to form an area referred to as "the Narrows." Northerly of the Narrows is the section of the Lake referred to as "Round Pond." The existing DFW fishing access is located in the Round Pond section, on the Lake's easterly shore.

11. This particular public access point is located in a relatively self-contained portion of Round Pond known as the Cove. There are numerous homes with private docks and other private access points to the Lake near the public access point.

12. The Lake is generally popular with boaters and swimmers, especially those who own or use residences along or near the Lake. The public access point is presently used to launch kayaks and other paddling devices as well as sail and motor boats.

13. Swimming is forbidden at DFW access areas, but fishing is permitted in accordance with DFW regulations. Public water rules require that boats within 200 feet from shore travel at a lower speed that does not produce a wake, generally regarded as no more than 5 mph.

14. The appealing Neighbors own residences along or near the shores of Lake Rescue. Neighbor Katherine Haslam owns the property and home adjacent to the easterly boundary of the DFW access area. She generally occupies her home about four weeks per summer (1-2 weeks in June and 1-2 weeks in August).

15. The properties of the other appealing Neighbors are located nearby, but not adjacent to the DFW access area. All of the Neighbors use Fishing Access Road as access to their respective properties.

16. LRA is a private organization established nearly 90 years ago. LRA is managed by many of the Neighbors appearing in this litigation, as well as other residents, with LRA members totaling up to 150 area residents that include fishing people, boaters, environmentalists, homeowners, and local businesses. LRA is not a homeowners' association, but rather is a community organization with a devotion to maintaining and preserving the environmental quality of Lake Rescue.

17. Unfortunately, and as is true at many other Vermont lakes, Lake Rescue has suffered for a number of years from the introduction of a foreign invasive species known as Eurasian Watermilfoil ("Milfoil"). It is an exotic species that grows just below the surface of a fresh water lake. Its leaves are feather-like that grow in shallow water (i.e.: less than 13 feet deep). Milfoil's stems are red to brown in color. It can dominate a pond very quickly once its leaves are broken up by motor boat propellers or other human contact. Pieces of the plant quickly and easily grow roots to develop a new plant.

18. Appellants and others have embarked on a herculean task of removing the Milfoil from many portions of Lake Rescue. These efforts include individual underwater swimmers hand picking the plants, being careful not to allow leaves to break off from the hand-picked plants that may generate new roots and reestablish on the shallow portions of the Lake. The Milfoil removal efforts also employ a barge and other mechanisms to harvest the Milfoil.

19. The Milfoil harvesting efforts also employ individual divers who hand pick the plants. They must be careful not to break the plant leaves, less more Milfoil is established. The divers have also used underwater bottom barriers of material measuring about 10 feet by 50 feet that can smother the established Milfoil.

20. To complete this careful harvesting of the Milfoil, LRA has expended enormous sums each year to cover the costs incurred to reduce the further spread of Milfoil in Lake Rescue. Despite the herculean efforts, Milfoil has spread in Lake Rescue, especially after the infiltration of sediment from the Black River caused by Tropical Storm Irene. In fact, Milfoil has recently been located in the adjacent Lake Pauline, which is located to the south and fed by waters flowing from Lake Rescue.

21. The trial testimony appeared undisputed that LRA's efforts have helped reduce the spread of Milfoil in Lake Rescue.

## II.    Existing Recue Lake Fishing Access

22.    As noted above, the existing DFW access area on Lake Rescue was first established in the 1970s on two parcels DEC first acquired in 1954. It consists of a cleared gravel ramp to the edge of the Lake that can accommodate as many as three parallel boat or kayak launchers at the edge of the water. A concrete pad that begins just above the water line and which continues into the water in the middle of this ramp area allows for a single boat launcher to back a boat on a trailer into the water.

23.    During the summer months, this access area can be busy. Since there is presently no dock at this access areas, boats that are waiting to be pulled from the Lake will often idle in the water, just beyond the concrete pad. These idling boats, particularly those with motors, can sometimes churn up the underwater areas, including those where Milfoil has been established.

24.    There is a small parking area above the access area that can safely accommodate only about 3 to 4 boat trailers and a few parked vehicles.

25.    Particularly during the summer months, and especially on the weekends, the parking area fills up. Some Neighbors credibly testified that sometimes, when the parking area is full, some people attempting to use the DFW access area park on the edge of Fishing Access Road. However, when asked how many cars the witness has observed parked beyond the parking area, she replied "two to three" vehicles.

26.    That same witness expressed concerns about accidents occurring during these days of relatively heavy traffic. However, when asked for details, the witness admitted that she has never observed an actual accident in the area of the DFW access area, but rather just several "close calls."

27.    Despite established prohibitions, neither the Town of Ludlow ("Town") or DFW have installed or maintained "No Parking" signs beyond the parking area, nor "No Swimming" signs at the DFW access area.

## III.    Proposed Improvements to Fishing Access

28.    DFW seeks permission to add a floating dock at the public access point it manages on the Round Pond section of Lake Rescue. The stated purpose for the project is to bring the site into compliance with the Americans with Disabilities Act (ADA). DFW has embarked on a process of installing ADA-compliant docks at its access points around the state, thereby making such sites more accessible to individuals with certain mobility impairments.

29.    Many of the ADA-compliant docks that DFW installed and maintains on Vermont Lakes are in the Northern part of our State. Few are presently located in the Southern part of our State.

30.     Historically, the installation of ADA compliant docks at Vermont access areas has not resulted in a measurable increase in visitor traffic. These docks have principally allowed visitors with disabilities to have an easier time launching and getting in to and out of boats.

31.     DFW initially applied for approval for a floating dock that would be located to the left of the concrete pad located in the water of Round Pond.

32.     DEC regulations and State statutes require a shoreline encroachment permit to authorize construction of this water-bound dock, as an encroachment into public waters of our State. DFW applied for such a permit in January 2018. DEC solicited and received written comments and held several public informational meetings on the proposal. In August 2018, DEC issued a permit for the project, numbered 2536-LEP. Neighbors appealed that determination to this Court.

33.     In February 2020 DFW applied for an amendment to Permit 2536-LEP to approve a relocation of the proposed floating dock from one side of the boat launch ramp to the other. This amendment application proposed the same dock as presented in DFW's 2018 application; the application simply proposed that the dock would be located to the right (easterly) of the existing concrete pad. DEC approved this amendment application as a minor permit amendment; the amended permit was issued in March or 2020.

34.     This change of location for the proposed dock was made by DFW officials, after consultation with an accessibility specialist, who recommended the change in location to make it easier for someone driving a vehicle with a boat trailer, since the relocated dock would now be on the driver's side of a backing up vehicle with a boat trailer, thereby making the dock more visible to the driver and easier for the driver to access. With the dock on the driver's side, managing the boat as it slipped off its trailer and into the water would be more easily managed.

35.     Once a boat slips off of its trailer and fully into the water, the driver would be able to easily tie the boat to the dock.

36.     The dock as proposed is depicted in a diagram prepared by Dock Doctors, a copy of which was included in DFW Exhibit 3(a), at page 5. The dock would be 6 feet wide and a total of 48 feet in length. Its installation would begin with a 6-foot by 6-foot platform anchored just above the shoreline, to the right of the concrete pad. This platform will be anchored to the shoreline with 4-to-6 inch pilings into the ground. A 24-foot dock would be attached to the shoreside platform, with the dock extending into the water. At the end of that dock there would be another 24-foot section, attached to the first, and extending further into the water. During times of high water, nearly all of the full 48

feet of dock would be in the water and available for boat tie up; during times of low water, the available water-bound dock would be less, as depicted on DFW Exhibit 3(a).

37. Once installed, the first section of dock would have a hand railing, about 15 feet in length, installed on the right hand of the dock, to assist wheelchair bound visitors, and others, to safely walk on the dock. After the railing, there will also be a base curb for most of the remaining length of the dock to help prevent those in wheel chairs from rolling off of the dock. These details are also contained in the Dock Doctors diagram in Exhibit 3(a).

38. The dock will be constructed of a steel truss frame with wooden decking and plastic floats. After it is installed, DFW will put up signage for ADA parking and will designate an accessible route to the dock.

39. The proposed dock is designed so that, once installed, boats will be able to tie up to both sides of the in-water dock. The dock will be removed each fall, so as to preserve it, and then put back in place the next Spring.

40. The proposed dock will be compliant with all applicable ADA compliance regulations.

41. One additional benefit of this dock and its placement is that it will shield the sunlight from the Milfoil located underneath the dock, thereby retarding its growth and eventually killing it, much like the bottom barriers that LRA has installed.

42. Several DFW officials provided credible testimony, including Michael Wichrowski (DFW Lands and Fisheries Administrator) and Lael Will (DFW Biologist). Much of their testimony was not specifically contradicted. While Neighbors presented their concerns that the proposed dock would increase the Milfoil infestation and increase the visitors to the Lake Rescue access area, they provided no credible specific testimony or other evidence to support such claims.

43. Ms. Will is familiar with Lake Rescue and visited the access area on two occasions specifically to assess the area and potential impacts. Ms. Will also did an underwater assessment during one of her visits by snorkeling. Her testimony was credible and not specifically contradicted. Based upon her testimony, the Court concludes that the proposed dock will not have a measurable impact upon shoreline vegetation, aquatic habitat, or water quality. There will be no excavation, no fill, and no disturbance to the Lake bottom.

44. Mr. Wichrowski also provided credible testimony that was also not specifically contradicted. His testimony convinced the Court that the proposed dock will have no measurable impacts on area fish and wildlife.

**Discussion**

The importance of the public's right to use and enjoy public lands and waters are recognized in our Constitution, Vt. Const., ch. II, § 67, but has origins that date back centuries. See State v. Central Vt. Ry., Inc., 153 Vt. 337, 342 (1989) (referencing the public trust doctrine as "having its roots in the Justinian Institutes of Roman law."). Lands submerged beneath navigable waters in our State have long been regarded as being held for the benefit of the general public, and "[t]itle to these [submerged] lands is deemed to be 'held in trust for the people of State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties.'" Central Vt. Ry., 153 Vt. at 341 (quoting Ill. Central R.R. v. Ill., 146 U.S. 387, 452 (1892)). In the appeal now before us, it is agreed that the waters of Lake Rescue are subject to the Public Trust Doctrine. We therefore must determine whether the proposed DFW dock violates that Doctrine before concluding whether Applicant is entitled to the requested lake encroachment permit.

Prior to the Permit Reform Act of 2004 that transferred jurisdiction over encroachment permits to this Court, the former Vermont Water Resources Board considered these appeals and applications. While that Board no longer exists, and its successor—the Water Resources Panel of the Vermont Natural Resources Board—is not vested with appellate responsibilities, we are directed to give some weight and precedent to prior decisions of the former Board, given its broad prior experience in these areas. 10 V.S.A. § 8504(m). We therefore look to and rely upon the former Board and its decisions for guidance.

In a 1995 Memorandum of Decision, the former Water Resources Board provided perspective and guidance on the appropriate review of such project applications under the Public Trust Doctrine. *See* In re: Dean Leary (Appeal of DEC Permit No. 93-29 Point Bay Marina, Charlotte, Vermont), No. MLP-94-08, Mem. of Decision, at 4–5 (Vt. Water Res. Bd. Apr. 13, 1995). The Board concluded that it had "a duty, independent of the public good determination under 29 V.S.A. § 405, to assure the protection of public trust uses" and stated the following:

> As a part of State government, the Board has a fiduciary obligation under the public trust doctrine to determine that encroachments will not have a detrimental effect on public trust uses. Hazen v. Perkins, 92 Vt. 414 (1918); State v. Malmcuist, 114 Vt. 96 (1944); In re Establishment of Water Levels of Lake Sevmour, 117 Vt. 367 (1952); State of Vermont v. Central Vermont Railway, Inc., 153 Vt. 337 (1989). In making this determination, the Board may rely on the guidance provided by case law both from this jurisdiction and other jurisdictions recognizing the public trust doctrine. In many instances, the uses identified in 29 V.S.A. § 405 are identical to the uses protected by the public trust [doctrine].

Id. at 4–5.

While the protection of public trust uses is held in high regard, it does not act as an absolute barrier to private development or encroachment into public waters; the interest to be protected is the use, and not the public resource itself. Re: Kent Pond (Vt. Dept. of Fish § Wildlife), Nos. MLP-03-10 and MLP-03-11 (Cons.), Findings of Fact, Conclusions of Law, and Order, at 12 (Vt. Water Res. Bd. May 12, 2004). Once we have identified the public trust uses at issue in this appeal, we must balance the impacts of the encroachment, if any, on public trust uses with the encroachment's public benefits. Id. (citing Re: Killington, Ltd., Nos. MLP-97-09 and WQ-97-10, Findings of Fact, Conclusions of Law, and Order, at 55–57 (Vt. Water Res. Bd. Aug. 14, 1998)).

The parties here agree that the public trust uses at issue here relate to the ability to boat, fish, and swim in the waters of Lake Rescue. The most active and frequent uses within the vicinity of the proposed dock expansion are public boating and kayaking, swimming, and fishing. Winter activities occur to a lesser extent, particularly outside of the area encompassed by the proposed DFW dock.

In fact, the absence of a public access dock on Lake Rescue would discourage use of the Lake by some members of the general public, particularly those who have disabilities. The presence of the proposed DFW dock on Lake Rescue, as well as the 40 or more other fishing access docks that DFW maintains throughout the State, encourage and assist the use and enjoyment within those public waters by many members of the public, including those with disabilities. While we recognize that unchecked dock installations could frustrate public use and enjoyment, we cannot conclude that the mere installation of the proposed DFW dock will have a detrimental impact on the overall use of Lake Rescue by members of the public.[3]

We now turn to the specific statutory and regulatory provisions that govern the application presented to this Court in this appeal, and the interplay between those provisions and the legal issues presented by Appellants' Statement of Questions, as reduced and refined by our June 9, 2021, decision on DFW's motions for summary judgment or dismissal.

The statutory provisions governing encroachments into public waters mirror the constitutional protections, recited above and commonly referred to as the Public Trust Doctrine. *See*

---

[3] We note that the preceding paragraphs were copied in large part from a prior decision from this Court: In re Champlain marina, Inc. Dock Expansion, No 28-2-09 Vtec at Pp. 19–20 (Vt. Super. Ct., Envtl. Div. Jan. 10, 2011) (Durkin, J.). We have not enclosed the repeated language in quotation marks, both because the undersigned was the original author, and the language in these paragraphs has been revised to more accurately reflect the dock that DFW proposes to install on Lake Rescue.

29 V.S.A. §§ 401 through 410.  Specifically, § 401 provides a detailed policy provision that mirrors the tenants of the Public Trust Doctrine:

> Lakes and ponds that are public waters of Vermont and the lands lying thereunder are a public trust, and it is the policy of the State that these waters and lands shall be managed to serve the public good, as defined by section 405 of this title, to the extent authorized by statute.  For the purposes of this chapter, the exercise of this management shall be limited to encroachments subject to section 403 of this title.  The management of these waters and lands shall be exercised by the Department of Environmental Conservation in accordance with this chapter and the rules of the Department.  For the purposes of this chapter, jurisdiction of the Department shall be construed as extending to all lakes and ponds that are public waters and the lands lying thereunder, which lie beyond the shoreline or shorelines delineated by the mean water level of any lake or pond that is a public water of the State, as such mean water level is determined by the Department. . . ..

29 V.S.A § 401.

Section 403 provides that "no person shall encroach on any of those waters and lands of lakes and ponds under the jurisdiction of the Department without first obtaining a permit under this chapter."

An encroachment application "shall set forth the location, type, size, and shape of the encroachment and the plans and specifications to be followed in the construction." 29 V.S.A. § 404(a).  Given that no party disputes that DFW's application provides all of these details, we concur with the prior DEC determination that the application is complete, and we affirm that determination here.

In evaluating an encroachment permit application, DEC in the first instance and this Court on appeal, is directed as follows:

> In determining whether the encroachment will adversely affect the public good, the Department [and this Court on appeal] shall consider the effect of the proposed encroachment as well as the potential cumulative effect of existing encroachments on water quality, fish and wildlife habitat, aquatic and shoreline vegetation, navigation, and other recreational and public uses, including fishing and swimming, consistency with the natural surroundings, and consistency with municipal shoreland zoning ordinances or any applicable State plans.  If the Department determines, after reviewing the applications, the written comments filed within the notice period, and the results of the investigation, that the proposed encroachment will not adversely affect the public good, the application shall be approved.

We are provided with further guidance in our determinations by the definition section of title 29, chapter 11, which provides that the "'[p]ublic good' means that which shall be for the greatest benefit of the people of the State of Vermont."  29 V.S.A. § 402(6).

Further guidance was provided by the former Water Resources Board when considering a DFW encroachment application for an ADA-accessible fishing platform within the public waters of Kent Pond in the Town of Killington:

> While the Board must consider the public good elements listed in 29 V.S.A. § 405(b), it is not required to make an affirmative finding and conclusion with regard to each "public good" element. . . .. Rather, 29 V.S.A. § 405(b) sets out the elements to be considered, and no single element is dispositive of whether the encroachment adversely affects the "public good."

Re Kent Pond (VT Dept of Fish & Wildlife), 2004 WL 1090633, Nos. MLP-03-10 and MLP 03-11 (Cons.) Findings of Fact, Conclusions of law, and Order at 7 (Vt. Water Res. Bd. May 12, 2004), *citing* Re: Killington, Ltd., Nos. MLP-97-09 and WQ-97-10, Findings of Fact, Conclusions of Law, and Order at 39 (Aug. 14, 1998). The Kent and Killington precedents have remained unchallenged in their 20- and 26-year histories.

It is with this precedent in mind that we turn our analysis to Appellants' Amended Supplemental Statement of Questions.[4]

By their Question 3, Appellants ask "[w]hether the encroachments as proposed [by DFW] will substantially and adversely affect the water quality of Lake Rescue?". Appellants' Amended Supplemental Statement of Questions, filed on July 1, 2021, at 2. Given the detailed presentations at trial by Appellants, DFW, and DEC, we conclude that there was no credible testimony or other evidence presented that the dock DFW proposed for the Lake Rescue fishing access area will have any adverse impact on the Lake's water quality, much less a "substantial and adverse" impact. We therefore must answer Appellants' Question 3 in the negative.

By their Question 4, Appellants ask "[w]hether the encroachments as proposed will result in erosion of the shorelines of Lake Rescue?" We answer Question 4 in a similar manner, as there was no credible testimony or other evidence presented that substantiated Appellants' concerns about erosion on the shorelands or elsewhere.

This and several of Appellants' other Questions highlight an oft-repeated premise that Appellants presented at trial: they have many concerns and fears about the possible impacts that DFW's proposed dock may bring to their neighborhood. But they failed to present credible evidence at trial to substantiate the factual foundation for their concerns and fears. For these reasons, we must answer Appellants' Question 4 in the negative as well.

---

[4] We limit our analysis to those Questions that survived after our June 9, 2021 decision.

Appellants present a general query by their Question 5: "[w]hether the encroachments as proposed will serve the public good." Given our responses above to Appellants' Questions 3 and 4, as well as our remaining responses below, we conclude that the DFW proposed dock will serve the public good, in that it will assist those attempting to use the Lake Rescue waters. However, whether a proposed encroachment will "serve" a public good is not a legal issue that either the Public Trust Doctrine or the applicable statutory provisions require us to address.[5] Rather, we are directed to determine whether "the [proposed] encroachment will adversely affect the public good." We remain focused on the analysis we must complete under the Doctrine and the statutory provisions of title 29, chapter 11.

By their Question 6, Appellants ask "[w]hether the improvements as proposed will result in a migration of sediments within the water body as to substantially and adversely affect Lake Rescue as a whole, the nearby area and cove, and the channel passage between this portion of Lake Rescue and other portions?" Id.

The members of the Lake Rescue Association have done a tremendous job of battling not only Milfoil infestation in Lake Rescue, but also the intrusion of sediments from the Black River, which flows into Lake Rescue from an inlet located across Round Pond from the DFW access area, as well as the paved and unpaved roadways that are located close to Lake Rescue, including Vt. Route 100. These sediment deposits were exacerbated in 2013 by Tropical Storm Irene, which devastated our entire State.[6] In response, LRA employed dredging equipment near the Black River inlet and between the Narrows, where sediment was also deposited, to improve the area. These efforts by LRA likely contributed to the saving of these portions of the Lake.

---

[5] Appellants argue that DFW bears the burden of showing that the Project will serve the public good. However, this argument misconstrues the relevant burdens that an applicant has in the context of a public waters encroachment application. Rather, DFW has the burden of producing "sufficient evidence for [the Court] to make positive findings with regard to the Project on the public good and public trust issues." In re Champlain Marina, Inc., No. 28-2-09 Vtec at 13 (Jan. 10, 2011) (citing In re Dean Leary, No. MLP-94-08, Mem. of Decision, at 10 (Vt. Water Res. Bd. Apr. 13, 1995). It is then the Court's responsibility to weigh the credibility of the evidence presented and make the necessary factual findings and conclusions. As explained in the analysis that follows, the Court concludes that DFW has met its burdens of production and persuasion with respect to the relevant considerations under Public Trust Doctrine.

[6] An aerial overview of the location of the Black River inlet into Lake Recue is depicted in a Google Maps screenshot contained in a report titled "Lake Rescue State Fishing Access Proposed Dock Report" which was admitted at trial as Appellants' Exhibit B. Some parts of that report were redacted by the Court in its Entry Order of January 13, 2022. The redacted portions are not germane to the sediment issues discussed here. The Google Maps areal depiction of the Black River inlet is shown on page 51 of Exhibit B.

While we commend these efforts, and mourn the sediment deposits, our task must remain focused upon the impacts that the dock DFW proposes has on the public uses of the Lake, and we find no correlation between the two. There was no credible testimony presented of measurable sediments deposited in the area of the DFW access area, and no credible evidence that the proposed dock could contribute to the migration of sediments in the area of the proposed dock, or any area within the Lake, for that matter.

Such a sediment migration that could be caused by the proposed dock could cause us to conclude that the dock adversely affects the public good uses in Lake Rescue, but no such evidence, or even credible suggestion of it, was presented at trial. We therefore conclude that we must answer Appellants' Question 6 in the negative.

By their Question 7, Appellants ask "[w]hether the improvements as proposed will result in increased turbidity within Lake Rescue as a whole, and the nearby area and cove in particular?" We were not presented with any credible evidence that either the installation of the proposed dock, its seasonal removal and replacement each Fall and Spring, respectively, and its use during the warmer months will be the cause of increased turbidity. The dock itself is designed to float upon the water and a crane or lift will be used to remove and reinstall it each season, without the equipment entering the water. Given these construction, removal, and replacement procedures, we conclude that we were presented with no credible evidence of these actions causing increased turbidity within the Lake.

Appellants repeatedly claimed at and prior to trial that the proposed dock would entice more visitors to access Lake Rescue. However, their trial presentations provided no specific evidentiary foundation to support their concerns. In contrast, DFW presented several witnesses, including Mr. Wichrowski, who testified about their extensive experience with DFW access areas, both those with docks and those without docks. Mr. Wichrowski provided credible and extensive testimony about his experience observing and managing DFW access areas and docks, and he credibly testified that no access area has seen a measurable increase in use at the DFW access areas once a DFW dock was installed, including when ADA-compliant docks were installed. Rather, the docks have contributed to easing the accessibility of these waters by disabled persons and not a measurable increase in the number of visitors using them. Again, while Appellants have a sincere concern about an increase in use at the Lake Rescue access area, we received no credible evidence to support their concern. Without evidence that anticipates a measurable increase of visitors, or evidence of how the same number of users would contribute to an increased turbidity within Lake Rescue as a whole, or the nearby area and cove in particular, we must answer Appellants' Question 7 in the negative.

Appellants first presented a simpler, albeit somewhat vague challenge in their original Question 8, filed on September 7, 2018, which asked "[w]hether the size and configuration of the improvements as proposed will create a public safety hazard?" The State entities challenged the use of the term "public safety hazard" as not specifically referenced in 29 V.S.A. § 405(b) (or any other applicable statutory provision) and that such a term was "unduly broad." In our June 9, 2021 Entry Order addressing the State's challenges to several of Appellants' Questions, we concurred, concluding that Appellants must clarify that Question. We directed that Appellants clarify their Question 8 "within the framework" [of their original Question] so as to provide citations to the applicable standards and specific definitions for what is intended by their reference to 'safety'". Id. at 23.

In response, Appellants provided a more expansive Question 8. *See* Appellants' Amended Supplemental Statement of Questions, filed on July 1, 2021, at 2–3. They chose not to provide specific citations to the applicable standards or definitions. Rather, Appellants in a multi-page revised Question 8, which contains a main Question and six sub-parts, that have a general reference to adverse impacts upon navigation, recreational uses, the width and length of the proposed dock, congestion, possible impacts caused by collisions with swimmers and other boats, the impacts from larger boats being attracted to the proposed dock, general increases in use, the possibility that the proposed dock will obstruct the view of swimmers, fishing people, and other boaters, increases in traffic on the lands leading to the dock, and the increased collision dangers in the water or on nearby lands, including "injury to pedestrians including children at or near the ramp and dock." Id at 3.

We need not go in to great detail in response to Appellants' revised Question 8, since there was scant evidence offered at trial to establish the factual foundation for the concerns detailed in this revised Question. We first note that due to the limitations of the applicable statutory provisions, we do not have jurisdiction to entertain assertions about the possible impacts that the proposed dock may have beyond the shoreline and on the surrounding lands. More importantly, we received no credible evidence that larger boats will be attracted by the proposed dock, or that the dock is of such a size to obstruct the view of other boats, boaters, fishing people, or swimmers. We note that swimming is prohibited in the area of the existing Lake Rescue access area, and swimming will continue to be restricted in that area after the DFW proposed dock is installed.

We again note that Mr. Wichrowski provided convincing testimony, not specifically contested, that the installation of other ADA-compliant docks at other DFW access areas have not resulted in a measurable increase in use, and that DFW does not expect that its proposed ADA-compliant dock on Lake Rescue will encourage a greater number of visitors than those that currently visit the existing

access area. Rather, these docks have historically resulted in easing the ability for disabled individuals to access DFW access areas. Once we received this testimony from Mr. Wichrowski, Appellants were obligated to present contradictory evidence concerning how an ADA-compliant dock would cause a measurable increase in users on Lake Rescue. We received no such evidence. Sincerely based concerns do not constitute such evidence.

We therefore answer Appellants' revised Question 8 in the negative.

By their Question 9, Appellants ask "[w]hether the proposed encroachments will increase the contamination of Lake Rescue with invasive species, including *Eurasian Milfoil*?" Id. (emphasis in original). Given that we have already concluded that the proposed dock will not materially increase the number of users at this DFW access point, we do not see a foundation for Appellants' concerns here. Historically, the infestation of Milfoil, as well as other evasive species, has been tied to boats from foreign waters coming to a lake, including Lake Rescue. Once established, Milfoil and other evasive species spread and thrive. To counter these effects, the LRA, with the consent of DFW and DEC, encourage visiting boaters to drain and wash their boats before launching. These efforts, together with LRA's dredging efforts and Milfoil eradication efforts, have reduced the spread of Milfoil in Lake Rescue. The Court commends LRA's continued efforts.

Absent from any credible trial presentation was evidence that the proposed DFW dock would actually "increase the contamination of [Milfoil] contamination of Lake Rescue." There was no credible evidence presented to support such a claim. In fact, DFW Fish & Wildlife Specialist Lael Will presented compelling testimony that the dock would actually slow or retard some growth of Milfoil, much like the bottom barriers that LRA has installed. These barriers retard the Milfoil growth by smothering the Milfoil and shielding the plant from sunlight. Thus, while there was compelling testimony evidencing that the proposed dock may retard Milfoil growth, there was no convincing evidence that the proposed dock would actually "increase" Milfoil and other evasive species in Lake Rescue. We therefore must answer Appellants' Question 9 in the negative.

By their Question 10, Appellants ask "[w]hether the proposed encroachments and activity associated therewith will adversely affect the fish and wildlife habitat of the cove in which they are to be placed and/or Lake rescue in general?" Id. We received no credible evidence to support such a claim. We therefore answer Appellants' Question 10 in the negative.

By their Question 11, Appellants ask "[w]hether the encroachments as proposed are consistent with the natural surroundings of the area?" Id. Our answer to this Question is an unqualified yes.

The area surrounding the existing DFW access area is evidenced by many house lots, many relatively small in size, that occupy lands along the shores of Lake Rescue, including the lands near the DFW access area. These lots are largely developed with single family homes, most of which are orientated towards the Lake. There are about 70 private docks around Lake Rescue connected to adjoining homes, including 12 or more closest to the DFW access area. These lands are orientated towards and devoted to enjoyment of Lake Rescue.

The DFW access area on Lake Rescue was established nearly fifty years ago and is accessed by a road named after it: Fishing Access Drive. The existing access area is not just consistent with the area uses, the area is largely defined by the access area.

The proposed dock will represent a complement to the existing access area by providing an easier opportunity for disabled individuals to use the area more easily. The proposed dock is not accompanied by a land-based application to expand the adjoining small parking area, which serves as a natural limitation to the number of visitors to the access area. Given that the credible and uncontradicted testimony was that the proposed dock will not result in a measurable increase in the numbers of people attracted to the area, we conclude that the proposed dock is consistent with its natural surroundings. We therefore conclude that we must answer Appellants' Question 11 in the positive.

By their Question 12, Appellants ask "[w]hether the project will adversely affect navigation, recreation, and other public uses of Lake Rescue?" Id. at 3. For the reasons already stated, we conclude that the proposed dock will not cause these adverse effects.

The proposed dock will be installed at an already established DFW public access area that has been open to the general public for nearly 50 years. Contrary to Appellants' assertions, the proposed dock will be installed to the right of the existing concrete ramp into the Lake waters, leaving both that ramp and the area to the left of the ramp intact, so that both the ramp and that left hand area will remain available for use by fishing people, those wishing to launch a kayak, and others. The proposed dock will provide a better and more accessible area for launching boats and fishing. Given its relatively small size[7] and somewhat isolated location, we conclude that the proposed dock it will not "adversely

---

[7] The proposed dock will encroach into the Lake waters by about 48 feet, as measured from the mean high water mark. Testimony at trial revealed that there are several larger private docks already existing on the Lake, some located well beyond the mean high water mark. We did not receive any evidence that these existing larger docks have somehow "adversely affect navigation, recreation, and other public uses of Lake Rescue."

affect navigation, recreation, and other public uses of Lake Rescue." We did not receive any credible evidence that the proposed DFW dock will cause such ill effects.

For all these reasons, we conclude that we must answer Appellants' Question 12 in the negative.

By their Question 15, Appellants ask "[w]hether the cumulative effect of existing encroachments on water quality, fish and wildlife habitat, aquatic and shoreline vegetation, navigation and other recreational and public uses, including fishing and swimming will be adverse to the public good?" Id at 4. Given that this Question appears premised upon an assumption that the "existing encroachments" already have such ill effects, we turn first to the evidence presented on that topic, or rather the lack of such evidence presented at trial.

There was no credible evidence presented at trial that the "existing encroachments" cause such "ill effects" and we choose not to assume that such ill effects have occurred. Lake Rescue is one of the larger fresh water bodies in Southern Vermont. It enjoys frequent use from visitors and area homeowners. However, there was no specific evidence presented at trial that the existing encroachments cause any material ill effects. During summer weekends, particularly a holiday weekend, Vermont fresh water lakes entice many visitors generally to their cool waters. But at our trial, we received scant evidence that the current uses of Lake Rescue somehow result in ill effects upon the uses of this public asset. A summer visitor to Lake Rescue may often see other swimmers, boaters, kayakers, and fishing people, but we received no credible evidence that the existing encroachments on the Lake have somehow materially restricted the use and enjoyment of the Lake.

While not specifically asked in this Question, we assume that Appellants are asserting that the proposed DFW dock will somehow aggravate such "ill effects." We received no credible evidence of such a result possibly being caused by this proposed dock.

For all these reasons, we answer Appellants' Question 15 in the negative.

When Appellants posed their original Question 16, they presented a rather straightforward request: "[w]hether in making its findings with regards to the issuance of the permit, the [DEC] unduly restricted the scope of the inquiry and gathering of evidence critical to rendering a proper decision?" Appellants' Statement of Questions, filed on September 7, 2018, at 4–5.

In our June 9, 2021 Entry Order addressing DFW's motion to dismiss or direct clarification of several of Appellants' Questions, we advised that Appellants' original Question 16 appeared to ask whether DEC committed procedural errors in its review of DFW's encroachment permit application. We noted that we were required to address appeals from ANR determinations on a *de novo* basis,

-19-

meaning that we are required to hear evidence anew and render our own legal determinations, and to not analyze ANR determinations on an on-the-record basis.  Id. at 23–24.

However, we also noted that Appellants' original Question 16 also appeared to not specifically address challenges that were appropriate under our *de novo* process and therefore directed Appellants to clarify their Question 16.  Id. at 24.

In response, Appellants filed their Amended Supplemental Statement of Questions on July 1, 2021, which contained a revised and expanded Question 16.  In reviewing that revised and expanded Question 16, we are concerned that Appellants continue to appear to be challenging how DEC "unduly restricted the scope and investigation in proposing the project . . .."  Appellants' Amended Supplemental Statement of Questions, filed on July 1, 2021, at 4–5.  To the extent that Appellants continue to use their Question 16 to challenge DEC's processes below, we again **DISMISS** their Question 16 as beyond the scope of our *de novo* review.

Appellants' revised and amended Question 16 also contains six sub paragraphs that challenge the "sufficiency" of DEC's investigation concerning the likelihood that the proposed dock will entice larger boats and an increased frequency of boats, cause increased congestion, and increases in "wave and wake production."  Id.  We have already addressed these challenges in our *de novo* review, above, and see no need to repeat that analysis here.  To the extent that Appellants again challenge the procedures that DEC followed by their amended and revised Question 16 (a)–(f), inclusive, we conclude that such challenges to the DEC procedures are beyond the scope of our *de novo* review.

By their Question 17, Appellants ask "[w]hether the decision of the [DEC] should be reversed and/or modified, and the permit issued thereby should be revoked and/or modified?"  We view this Question as overly broad and going to the ultimate legal question in this appeal, much like the legal issue posed in Appellants' Question 5, addressed above.  For the reasons detailed in all our responses to Appellants' prior Questions, we conclude that the evidence presented in this *de novo* appeal convinces this Court that the DEC determinations on DFW's encroachment permit application should be **AFFIRMED**, without modification.

We therefore answer Appellants' Question 17 in the negative.

We now address the last remaining Question presented by Appellants: Question 20, which originally asked "[w]hether the purported Amended Permit aggravates the problems involved in this project?"  Appellants' Supplemental Statement of Questions, filed May 12, 2020, at 3.  Appellants supplemented their original Statement of Questions with this new Question, after Appellants and the Court were made aware of DFW's application to amend its encroachment permit by revising the

proposed dock plans to move the location of the dock from the left side of the concrete ramp to the right side of the concrete ramp. No other changes were proposed in this amendment application; the proposed dock would encompass one of the three lanes at the Lake Rescue fishing access area. That relocated dock, as we've noted above, allows for a visitor who was attempting to launch a boat to more easily access the boat while launching and securing, since the proposed dock would now be on the driver's side of the vehicle towing the boat.

In response to DFW's motion to dismiss or order clarification of Appellants' Supplemental Statement of Questions, we concluded that this Question was vague and ambiguous and ordered Appellants to clarify what was meant by the term "aggravating problems." *See* In re Rescue Lake [sic] Encroachment Permit, No. 92-8-18 Vtec at 24–25 (Vt. Super. Ct. Envtl. Div. June 9, 2021) (Durkin, J.).

Appellants then filed their Amended Supplemental Statement of Questions on July 1, 2021, which included a revised and expanded Question 20. That revised Question added six sub-paragraphs that listed "[c]ongestion at the launch site"; a "[s]ignificant reduction in the amount of shoreline available to individuals seeking to launch small non-motorized craft"; "[c]ongestion in the waters at or near the launch site including the approaches to the [dock] by large and small motorized craft"; "[i]ncreased concentration of active propeller usage at or about the launch site increasing the turbidity and the spread of invasive species including Eurasian milfoil and wave action"; "[o]verlapping of traditionally recognized waterfronts endangering swimmers and fishing"; and "[i]ncreased traffic congestion at the public access site inconsistent with the natural setting." Appellants' Amended Supplemental Statement of Questions, filed July 1, 2021, at 6.

Appellants' amended supplemental Question 20 is premised upon facts not in evidence and not included in the legal conclusions that this Court has already reached in this Merits Decision. The DFW Lake Rescue access area will continue to have three lanes which people may use to launch their kayaks and boats, both motorized and non-motorized. The third lane on the right as one faces the water will now have a dock available to assist boaters and fishing people wanting to access the water. The addition of this dock will result in a more orderly and safe means by which boaters may launch their kayaks and boats (of any variety) to more safely and efficiently launch into the water and to secure their kayaks and boats to the dock. Before, these launchers were left to their own devices as to how to secure their kayaks and boats. Now, they will be able to more securely tie up their vessels. In fact, Appellants provided us with a picture of the current, somewhat more haphazard launching activities without a dock. *See,* Appellants Exhibit B at Pp. 39–47, showing Figures D-25 through D.42, inclusive.

-21-

If a dock were located in these photos as DFW proposes, these vessels would be more safely secured on the dock, including with multiple vessels on each side of the dock, with the dock still be available for boaters and fishing people to walk out onto the dock. Because of the proposed dock, there will be more (and not less) opportunities to access the Lake waters.

For these same reasons, a similar number of visitors will bring less congestion. DFW officials provided credible and convincing evidence that historically, when ADA-compliant docks are added to DFW access areas, a measurable increase of visitors has not been the result. Rather, individuals with disabilities will be able to more easily and safely enjoy boating on the Lake. As photos that Appellants supplied showed, disable people still enjoy boating and the lake waters; the lack of a dock doesn't completely discourage those individuals from their water activities. It's just that the lack of a dock can makes it more difficult for them to disembark from a boat. See Appellants Exhibit B at 37, D.22 and D.23.

The proposed dock will also allow boaters to more efficiently launch and retrieve their water vessels, as was credibly suggested by DFW witnesses.

We have previously concluded that the proposed dock will not likely encourage a measurable increase in visitors to the Lake Rescue access area. The dock will also allow boaters and kayakers to more quickly and efficiently enter the water and leave the access area. Motorized boaters are less likely to idle on the water, engines running as they are waiting to use the single concrete ramp. With the dock installed, multiple boaters and kayakers will be able to secure their vessels on both sides of the proposed dock, while they wait to load their vessels to their vehicles or trailers. These circumstances cause the Court to conclude the proposed dock with result in less active propeller idling usage, not more.

For all these reasons, we conclude that we must answer Appellants' multi-part Question 20 in the negative.

## Conclusion

With respect, we have rejected each and every one of Appellants' challenges to this proposed DFW dock. For all the reasons detailed above, we conclude that the DEC approval of DFW's initial encroachment application, as well as its amendment application to relocate the proposed dock to the easterly side of the concrete ramp, must be **AFFIRMED.**

This completes the current proceedings before this Court concerning this appeal. A Judgment Order accompanies this Merits Decision

Electronically signed on March 19, 2024, at Brattleboro, Vermont, pursuant to V.R.E.F. 9(d).

_____

Thomas S. Durkin, Superior Judge
Environmental Division